# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 25, 2022

Lyle W. Cayce
Clerk

No. 22-50117

Unite States of America,

*Plaintiff—Appellee*,

*versus*

Jonathan Jefferson Ferris,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 6:19-CR-288-1

Before Stewart, Dennis, and Higginson, *Circuit Judges*.
Carl E. Stewart, *Circuit Judge*:

Jonathan Ferris ("Ferris") appeals his conviction for violation of 18 U.S.C. § 912, claiming that the district court erred in adopting the Government's jury instructions. Ferris also appeals his sentence, arguing that the district court erred in applying the cross-reference provision in U.S.S.G. § 2J1.4(c)(1).[1] Because we hold that the jury instruction was

---

[1] Ferris also raised a third issue on appeal, regarding the potential impermissible delegation of judicial authority in his conditions of supervision. This issue was raised only

No. 22-50117

satisfactory, but the facts do not support application of the cross-reference provision to the drug-trafficking sentencing guidelines, we AFFIRM in part and VACATE and REMAND in part.

## I.    Background

### A. Ferris's Initial Arrest and Conviction

Ferris, a New York resident, made a call to King's Daughters Pharmacy ("King's Daughters") in Temple, Texas in July 2019. Anthony Collins ("Collins"), the owner of King's Daughters, answered Ferris's call and confirmed his ability to fill out-of-state prescriptions. Two days later, Ferris made the trip to Temple and worked with Melinda Jones ("Jones") to fill his prescription for fentanyl patches. Jones was the pharmacy clerk on duty with Collins out of town. She did not question Ferris or his business at King's Daughters because Collins left instructions for her to fulfill Ferris's prescription. Ferris entered King's Daughters donning a Federal Bureau of Investigation ("FBI") lanyard with an identification card showing his picture with the FBI's seal. While waiting for the pharmacist on duty to fill his prescription, Ferris told Jones that he had been injured on the job and would bring her an FBI lapel pin the next time he returned to King's Daughters.

A week later, Ferris returned to King's Daughters with an FBI-stamped envelope containing another prescription for fentanyl patches. Collins was present on this visit and was surprised at Ferris's quick return for additional patches. Collins made a call to the office of the doctor who wrote Ferris's prescription to confirm its validity and ultimately provided the patches to him after proper authentication. As Ferris promised, he returned with an FBI lapel pin for Jones. While Ferris did not present an FBI lanyard

---

to preserve it for further review. Both parties agree that it is currently foreclosed by our recent decision in *United States v. Mejia-Banegas*, 32 F.4th 450, 453 (5th Cir. 2022).

No. 22-50117

or identification this trip, he did communicate to Collins that he was an FBI agent doing fieldwork in Texas. Collins saw no reason to question Ferris's assertion, so he left it unchallenged and allowed Ferris to leave with his fentanyl patches.

Ferris returned to King's Daughters four days later. He presented another FBI-stamped envelope, this time with three prescriptions for fentanyl patches. Collins noticed that two of the prescriptions were illegally postdated. He called the prescribing doctor in New York again, confirmed the prescriptions' authenticity, and only filled the non-postdated prescription. Ferris attempted to persuade Collins to fill the postdated prescriptions by explaining that the FBI was sending him additional patches on a plane from New York. Even still, Collins refused to fill the two postdated prescriptions.

Before leaving with his fentanyl patches, Ferris told Collins to let him know if he ever ran into problems with the Board of Pharmacy because Ferris would be able to smooth things over for him. At this point, Collins was sufficiently disturbed by Ferris's statement and behavior and decided it was best that he contact the local FBI field office to confirm Ferris's identity. Upon doing so, Collins discovered that Ferris never actually worked for the FBI. After that revelation, Collins reported Ferris's transactions at King's Daughters to several federal authorities. Relying on the information obtained from Collins, the FBI executed a search of Ferris's residence in Cedar Park, Texas, discovering fake FBI credentials in his name, among other contraband.

Ferris was later charged with impersonating an FBI agent, in violation of 18 U.S.C. § 912. During his trial, the district court lacked a pattern jury charge for Ferris's alleged offense, so it ordered that Ferris and the Government proffer potential jury charges for the court to adopt. After

reviewing the jury charges, the district court elected to use the Government's over Ferris's objection. Ferris was subsequently convicted and sentenced.

### B. Ferris's Sentencing

Ferris's presentence investigation report ("PSR") noted that he committed the false impersonation offense in facilitation of drug-trafficking. Consequently, the PSR applied the cross-reference in U.S.S.G. § 2J1.4(c)(1) and calculated his base offense level using the guideline for drug offenses, under U.S.S.G. § 2D1.1. Given that Ferris had no criminal history, the PSR recommended a base offense level of twelve, in accordance with the total amount of fentanyl he received from King's Daughters. The PSR provided an advisory guideline range of ten to sixteen months imprisonment.

Ferris objected to the application of the cross-reference provision, claiming that he had a valid prescription for the fentanyl patches, so he did not commit any drug-trafficking offenses. Accordingly, he contended that his base offense level should have only been six under § 2J1.4(a). The Government maintained that Ferris's impersonation was used to provide cover for abusing his validly obtained prescriptions and accused Ferris of "pill shopping" for large quantities of fentanyl. Alternatively, it argued that application of the cross-reference provision was appropriate because Ferris attempted to cause Collins to unlawfully dispense fentanyl in violation of 21 U.S.C. § 841(a)(1). The district court was persuaded by the Government's argument and ultimately sentenced Ferris to twelve months of imprisonment.[2]

On appeal, Ferris argues that the district court failed to instruct the jury on the overt-act element of his false impersonation offense by declining

---

[2] Ferris's original sentence was sixteen months' imprisonment. However, the district court reduced his sentence to twelve months after further consideration of his medical history.

to adopt his proposed jury charge, and that this error was not harmless. Additionally, he contends that the district court erred in applying the cross-reference provision in § 2J1.4(c)(1).

## II.     Standard of Review

We review "a district court's refusal to provide a requested jury instruction for an abuse of discretion." *United States v. Wright*, 634 F.3d 770, 775 (5th Cir. 2011). However, "when the instruction is claimed to misstate an element of the offense, review is de novo, subject to harmless-error review." *United States v. Sanchez*, 502 Fed App'x 375, 381 (5th Cir. 2012) (citing *United States v. Guevara*, 408 F.3d 252, 257 (5th Cir. 2005)). "Erroneous jury instructions are harmless if a court, after a thorough examination of the record, is able to conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error." *United States v. Stanford*, 823 F.3d 814, 828 (5th Cir. 2016) (internal quotations omitted).

We review "the district court's factual findings for clear error and its interpretation and application of the [sentencing] guidelines, including any cross-reference provisions, de novo." *United States v. Griego*, 837 F.3d 520, 522 (5th Cir. 2016) (citing *United States v. Arturo Garcia*, 590 F.3d 308, 312 (5th Cir. 2009)).

## III.     Discussion
### *A. Jury Instructions*

18 U.S.C. § 912 provides that:

> Whoever falsely assumes or pretends to be an officer or employee acting under the authority of the United States or any department, agency or officer thereof, and acts as such, or in such pretended character demands or obtains any money, paper, document, or thing of value, shall be fined under this title or imprisoned not more than three years, or both.

5

This court has generally split § 912 into two separate and distinct offenses: "The first is that of assuming and pretending to be any officer or employee of the United States and acting as such. The second is demanding or obtaining any money, paper, document, or other valuable thing in such pretended character." *United States v. Cortes*, 600 F.2d 1054, 1056 (5th Cir. 1977). Ferris was charged with the first offense. Accordingly, he is guilty of false impersonation if he "(1) falsely pretend[ed] to be a federal officer and (2) act[ed] as such." *United States v. Tullos*, 35 Fed App'x 727, 728 (2009) (citing *United States v. Randolph*, 460 F.2d 367, 370). "Furthermore, this court requires proof of a third element—that the impersonator act with fraudulent intent, that is, intent to deceive another to act differently than he would have acted absent the deception." *Id.* at 728. "The second prong is satisfied where the defendant engages in 'any overt act consistent with the assumed character.'" *Id.* (quoting *United States v. Cohen*, 631 F.2d 1223, 1224 (5th Cir. 1980)). We have long held that "[m]erely falsely pretending to be an officer or employee of the United States with intent to defraud is not enough. An overt act is necessary to complete either offense." *Baas v. United States*, 25 F.2d 294, 294 (5th Cir. 1928).

First, we address Ferris's argument that the district court reversibly erred in adopting the Government's jury charge—in the absence of a pattern jury charge. According to Ferris, because the district court failed to give his proposed jury instruction, it effectively eliminated the Government's burden of proving the "acts as such" element of his alleged offense. The Government offered the following jury instructions for Ferris's § 912 violation:

> First, that the defendant falsely assumed or pretended to be an officer or employee acting under the authority of the United States;

> Second, that while acting in such an assumed or pretended character, the defendant committed any act;
>
> Third, defendant did so knowingly with intent to defraud.
>
> Finally, to act with intent to defraud means to act by intent or with intent by artifice and deceit, to cause another to cause some course he or she would not have pursued but for said deceitful conduct.

Ferris does not dispute that the first or third elements were satisfactorily explained to the jury. He does, however, take issue with the second element. For this reason, we only evaluate whether "the defendant committed any act" aligns with the statute's requirement that the defendant "acts as such." *See* 18 U.S.C. § 912.

Ferris offered the following jury instruction regarding the "acts as such" requirement in the second prong: "Mr. Ferris committed an overt act that asserted authority as a Special Agent of the Federal Bureau of Investigation." He contends that his proffered charge properly articulated § 912's second prong and would have permitted the jury to decide differently on his guilt. We disagree. Although the Government's jury charge fails to perfectly align with § 912's "acts as such" element, any resulting error was harmless under these circumstances for the following two reasons.

First, his requested jury charge—that the jury consider whether he committed "an overt act that asserted authority" as an FBI agent—contradicts our holding in *Cohen*. *See Cohen*, 631 F.2d at 1224 (requiring that the jury consider whether the defendant engaged in "any overt act consistent with the assumed character"). If the district court adopted Ferris's instruction, it would have tasked the jury with finding that Ferris literally asserted the authority of an FBI agent, instead of merely engaging in acts

"consistent with" his impersonation of an FBI agent. *Id.* Essentially, Ferris asks this court to exchange the Government's likely incorrect jury charge for his own undoubtedly incorrect jury instruction—an instruction that squarely conflicts with our decision in *Cohen*.

Second, Ferris never called for the jury to contemplate whether he committed any act or an overt act consistent with his impersonation of a federal agent. Put another way, nothing in the record indicates that the jury convicted him due to a misunderstanding of what was required under the second prong of § 912. At trial, Ferris never denied that he wore the FBI lanyard, said he was an FBI agent, presented false federal credentials, or completed any of the other alleged acts. Because the jury did not rely on the Government's overbroad "acts as such" instruction, any jury misunderstanding regarding this prong was likely harmless.

To be clear, the record fully supports Ferris's conviction under § 912: (1) Ferris intentionally and falsely pretended to be an FBI agent doing fieldwork in Texas; (2) he completed numerous overt acts consistent with his FBI agent impersonation; and (3) he completed the impersonation and overt acts with the "intent to deceive [Collins] to act differently than he would have acted absent the deception." *Tullos*, 356 Fed. App'x at 728. For these reasons, we are "able to conclude beyond a reasonable doubt that the jury verdict would have been the same absent" any error committed by the district court's adoption of the Government's jury instruction.[3] *See Stanford*, 823 F.3d at 828. Likewise, the district court did not abuse its discretion in denying Ferris's desired jury instruction or reversibly misstate an element of

---

[3] Ferris also argued that a possible First Amendment violation was before this court because the allegedly erroneous jury instruction criminalized his speech alone. Because the evidence demonstrates that he satisfied both elements of § 912, beyond mere boasting that he was an FBI agent, we need not explore this possibility further.

his offense in its adoption of the Government's. *Wright*, 634 F.3d at 775; *Sanchez*, 502 Fed App'x at 381.

### B. Cross-referencing

U.S.S.G. § 2J1.4 governs false impersonation of an FBI agent and provides a base offense level of six. *See* 18 U.S.C. § 912; § 2J1.4(a). Section 2J1.4(c)(1) permits cross-reference to a corresponding guideline "[i]f the impersonation was to facilitate another offense" and "the resulting offense level is greater than" level six. U.S.S.G. § 2D1.1 governs drug-trafficking offenses in violation of 21 U.S.C. § 841. Section 841(a) makes it unlawful for "any person [to] knowingly or intentionally . . . manufacture, distribute, or dispense" a controlled substance. All base offense levels under § 2D1.1 are greater than level six. Consequently, any cross-reference to § 2D1.1 stemming from § 2J1.4 requires a sentencing calculation under § 2D1.1.

21 U.S.C. § 841(a) permits "[r]egistered doctors [to] prescribe [controlled] substances to their patients" if the prescriptions are "for a legitimate medical purpose . . . in the usual course of [] professional practice." *Ruan v. United States*, 142 S. Ct. 2370, 2375 (2022) (citing 21 C.F.R. § 1306.04(a) (2021)). Violation of § 841(a) occurs where the Government can "prove beyond a reasonable doubt" that the medical professional "knowingly or intentionally" dispensed unauthorized controlled substances. *Ruan*, 142 S. Ct. at 2375; *see also United States v. Armstrong*, 550 F.3d 382, 396–97 (5th Cir. 2008). Accordingly, "[a]fter a defendant produces evidence that he or she was authorized to dispense controlled substances, the Government must prove beyond a reasonable doubt that the defendant knew that he or she was acting in an unauthorized manner, or intended to do so." *Id.* Furthermore, "one who puts in motion . . . or causes the commission of an indispensable element of an offense by an innocent agent or instrumentality, is guilty. [And] [i]t is not necessary for the intermediary to have a criminal intent." *United States v. Smith*, 584 F.2d 731, 734 (5th Cir. 1978); *see also* 18 U.S.C. § 2(b) (providing

that "whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal").

On this issue, Ferris claims that the district court misapplied the cross-reference provision in § 2J1.4. The Government contends that the district court's application of the cross-reference provision to the drug-trafficking guidelines was appropriate because Ferris attempted to cause Collins to unlawfully distribute postdated fentanyl patches, in violation of § 841(a)(1). It also claims that Ferris's continuous attempts to persuade Collins to fill unlawfully postdated fentanyl patch prescriptions similarly violated § 841(a). The Government maintains that Ferris is liable as a principal for attempted drug-trafficking even if the pharmacy staff at King's Daughters lacked any criminal intent throughout their dealings with Ferris. *See* 18 U.S.C. § 2.

In support of its position, the Government primarily makes a fact-intensive argument, highlighting a string of questionable conduct by Ferris to argue the plausibility of his attempted drug-trafficking through King's Daughters. Its argument focuses on: (1) Ferris's repeated visits to King's Daughters and requests for an increased dosage of fentanyl each time; (2) his repeated efforts to deceive the employees at King's Daughters of his status as an FBI agent; and (3) his pressuring Collins to fill postdated prescriptions even after Collins initially refused to do so. As the Government sees it, Ferris's actions were merely part of an elaborate scheme to make King's Daughters employees believe that he was a federal agent, so that he could exploit that status and cause the pharmacy to over-dispense fentanyl prescriptions.

Here, the record fails to support the Government's argument that Ferris attempted to traffic fentanyl. For the Government to prevail on its theory that Ferris's false impersonation was done in facilitation of violating § 841(a), it must prove beyond a reasonable doubt that Ferris or Collins had the requisite state of mind to be guilty of that offense. *See Ruan*, 142 S.

Ct. 2375. More specifically, it must prove that Collins "knowingly or intentionally" filled an invalid prescription for some reason other than a legitimate medical purpose. *Id.* Alternatively, it could prove that Ferris knowingly or intentionally caused Collins to fill invalid prescriptions for a non-legitimate medical purpose, including drug-trafficking. We address each theory in turn.

The Supreme Court's recent decision in *Ruan* provides timely guidance on how we evaluate the requisite state of mind for a pharmacist's violation of 21 U.S.C. § 841. 142 S. Ct. 2370. In that case, the Supreme Court vacated and remanded the convictions of two pharmacists charged with drug-trafficking under the Comprehensive Drug Abuse Prevention Control Act ("CDAPCA") and § 841. *Id.* The pharmacists maintained that they were innocent because the prescriptions were validly authorized prior to dispensation. On appeal, the pharmacists argued that the mens rea requirement was not properly articulated during the jury charge phase, which led to their improper convictions. The Court interpreted the import of the "knowingly and intentionally" mens rea requirement, holding that "knowingly or intentionally . . . applies to the 'except as authorized' clause" of the CDAPCA.[4] *Id.* at 2376. It explained that "[t]his means that once a [pharmacist] meets the burden of producing evidence that his or her conduct was authorized, the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner." *Id.* (internal quotations omitted). Consequently, the Court noted that in § 841 prosecutions, "it is the fact that the doctor issued an *unauthorized* prescription that renders his or her conduct wrongful, not the fact of the dispensation itself." *Id.* at 2377 (emphasis in original).

---

[4] *See Ruan v. United States*, 142 S. Ct. 2370, 2378 (2022) ("Section 841 states: "*Except as authorized* by this subchapter, it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance.") (alteration in original) (emphasis added).

Applying *Ruan* here, there is no evidence on this record that Collins did anything but perform his routine medical function for Ferris, having only issued authorized prescriptions to him. None of the prescriptions that Ferris brought to King's Daughters were unauthorized in a manner inconsistent with *Ruan*. Even the postdated prescriptions—which Collins never filled for Ferris—were technically authorized because they were validly issued by an out-of-state doctor.[5] As the Court acknowledged in *Ruan*, "authorization plays a 'crucial role' in separating innocent conduct—and, in the case of doctors, socially beneficial conduct—from wrongful conduct." *Id.* (quoting *United States v. X-Citement Video*, 513 U.S. 64, 73 (1994)). Here, Collins contacted the prescribing doctor in New York prior to filling Ferris's prescriptions, received confirmation that the prescriptions were all valid, and refused to fill the postdated prescriptions. Like the pharmacists in *Ruan*, there is no evidence that Collins knowingly or intentionally filled unauthorized prescriptions for a patient. Nor is there evidence that he accidentally filled unauthorized prescriptions. Instead, the record demonstrates that he merely operated in the usual course of his profession when filling Ferris's authorized prescriptions. Because Collins's actions did not violate § 841(a), the Government cannot prove that Ferris caused him to violate the statute either.

The Government further contends that Ferris amassed his fentanyl prescriptions for the purpose of drug-trafficking. If that were the case, it argues that Ferris is guilty of attempting to persuade an unknowing Collins of over-dispensing fentanyl for the purposes of drug-trafficking, and such violation while impersonating an FBI agent triggers the cross-reference provision in § 2J1.4(c)(1). Here too, the Government's assertion is untenable considering the evidence before this court. First, nothing in the record suggests that

---

[5] At trial, Collins testified that it is common practice for a doctor to write fentanyl patch prescriptions in advance for patients likely to suffer severe intractable pain if forced to go without their medication while awaiting subsequent prescriptions.

Ferris sought rapid fulfillment of his prescriptions for later drug-trafficking. At best, the record suggests that Ferris was personally abusing his validly authorized fentanyl prescriptions.[6] Second, the record indicates that Ferris had a legitimate medical diagnosis and prescription for fentanyl patches years before entering King's Daughters or interacting with Collins. Without evidence to the contrary, the Government cannot reasonably claim that Ferris suddenly decided to begin trafficking his fentanyl patches. Lastly, this court has repeatedly held that "something more" is required to turn simple drug transactions into drug-trafficking or a conspiracy to traffic. *See*, *e.g.*, *United States v. Delgado*, 672 F.3d 320, 333–335 (5th Cir. 2012) (reasoning that Delgado's dealings were more than simple buy-sell transactions because the evidence demonstrated that he "knowingly participated in a plan to distribute drugs"); *see also United States v. Chapman*, 851 F.3d 363, 377 (5th Cir. 2017) (noting that "simple drug transactions between a buyer and seller alone do not amount to a drug conspiracy"). The record here only demonstrates that Ferris engaged King's Daughters in a series of "simple buy-sell transaction[s]," lacking any evidence that these transactions evolved beyond that. *Delgado*, 672 F.3d at 333. Because the evidence fails to show that Ferris intended to traffic his fentanyl patches, it likewise cannot demonstrate that he induced Collins into doing the same.

## IV.    Conclusion

For the foregoing reasons, we AFFIRM Ferris's conviction under § 912 but VACATE the district court's application of U.S.S.G. § 2J1.4(c)(1) and REMAND for resentencing in accordance with this opinion.

---

[6] The PSR recommended that Ferris "should be monitored for further abuses and provided with treatment which will benefit [him]."