# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 20, 2024

Lyle W. Cayce
Clerk

_____

No. 22-20328

_____

United States of America,

*Plaintiff—Appellee*,

*versus*

Parvez Anjum Qureshi,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:17-CR-389-1

_____

Before Jones, Richman, and Ho, *Circuit Judges*.

Priscilla Richman, *Circuit Judge*:[1]

Parvez Qureshi was convicted by a jury of one count of conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846 and four counts of distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1). After Qureshi's conviction, the Supreme Court decided *Ruan v. United States*,[2] which held that "once a defendant meets the burden of

---

[1] Judge Ho would affirm the district court's judgment and therefore does not join this opinion.

[2] 142 S. Ct. 2370 (2022).

producing evidence that" he was "authorized" to distribute a controlled substance, "the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner."[3] Because the distribution-count instructions' erroneous omission of that element was not harmless, we vacate Qureshi's convictions under Counts 2, 3, 4, and 5. We affirm Qureshi's conspiracy conviction because it required the jury to find that Qureshi knew the agreed-upon conduct was unauthorized. Accordingly, we vacate Qureshi's sentence for all counts and remand for further proceedings.

# I

Parvez Qureshi was convicted of conspiracy to distribute controlled substances and distribution of controlled substances. At trial, the Government established the following.

# A

Qureshi was raised in Canada and graduated from medical school in Pakistan in 1989. He moved to the United States, passed his equivalency examinations, and entered a selective family medicine residency at the University of Texas Health Science Center at Houston. He then completed a fellowship in geriatric medicine at Baylor College of Medicine. In the years preceding trial, Qureshi was an independent contractor and worked with a large hospitalist group.

Qureshi met Rubeena Ayesha at a pain management clinic. Qureshi testified that Ayesha trained as a physician in India, owned and operated her own hospital there, and had been published in Indian medical journals. Like Qureshi, Ayesha passed the equivalency examinations when she came to the

_____

[3] *Id.* at 2376.

No. 22-20328

United States, and she later became an Advanced Practice Registered Nurse (APRN). Qureshi was impressed by her background, and he suggested they work together to start her own independent practice. In April or May of 2014, Ayesha contacted Qureshi about acting as her supervising physician. He agreed, and they executed a legally required prescribing agreement, which incorporated the Texas Occupations Code's limitation against delegating Schedule II prescribing authority to an APRN.

Under Texas law, a physician can delegate the authority to prescribe Schedule III, IV, or V controlled substances—but not Schedule II controlled substances—to an APRN.[4] Oxycodone (Oxy) is classified as a Schedule II controlled substance.[5] As of October 2014, hydrocodone (Norco) is also classified as a Schedule II controlled substance.[6] Carisoprodol (Soma) is classified as a Schedule IV controlled substance.[7]

Shortly after Qureshi and Ayesha executed the prescribing agreement, Ayesha started Spring Shadows Medical Clinic as a family medicine practice. Spring Shadows functioned in a typical manner for a family medicine practice—patients came for school or sports physicals, colds, urinary tract infections, or antibiotics injections. It accepted insurance, and the base price for most visits was $35. When Spring Shadows first opened, Norco was not yet classified as a Schedule II controlled substance, meaning that APRNs could prescribe it. Some of Ayesha's first patients at the family medicine practice received prescriptions for Norco.

---

[4] Tex. Occ. Code § 157.0511.

[5] 21 C.F.R. § 1308.12(b)(1).

[6] *Id.*

[7] *Id.* § 1308.14(c).

In October 2014, after Norco was reclassified as a Schedule II controlled substance,[8] Qureshi approached Ayesha with a "business proposal." He asked if she was interested in partnering with him to open a pain clinic. She agreed, telling Qureshi she could "see up to 30 [patients] a day."

After that point, Spring Shadows shifted its focus from family medicine to pain management. Over the following fifteen months, the clinic saw thirty to forty patients on a normal day and up to forty to eighty patients on a busy day. Pain patients paid a flat fee in cash depending on the drug they sought: patients seeking Norco paid $250, which eventually increased to $300, and patients seeking Oxy paid $500. Qureshi testified that he set those rates according to the patient's history and the anticipated complexity of the visit, not on the medication sought, and that he based them on the rates set by other "registered pain management clinics in that area" with "similar practices." Spring Shadows did not accept insurance for pain patients. From December 2014 to February 2016, $1,595,470 was deposited into Qureshi's bank account from Spring Shadows.

According to the Government, the scheme worked as follows. Ayesha was in contact with "runners," who would find people to bring to the clinic to acquire prescriptions. The runner would pick up multiple people to pose as patients and give those patients cash to pay for the visit. The people would be quickly examined at the clinic and receive prescriptions for Norco, Soma, and sometimes other medication. The runner would then take the people to a pharmacy where the people would fill the prescriptions. The people would give the runner the filled prescription, and the runner would pay each person

_____

[8] *Id.* § 1308.12(b)(1).

$50.  The Government also alleged that individuals addicted to opioids would go to Spring Shadows to receive prescriptions.

Patients would line up on the sidewalk outside of Spring Shadows around 7:00 a.m., and the staff would begin admitting them inside at approximately 8:00 a.m.  People would arrive in groups but come into the clinic alone.  One witness testified to seeing money being exchanged outside the clinic.  The waiting room was often full.  On the days Qureshi came into the clinic, he would arrive from 9:00 a.m. to 9:30 a.m. and walk through the waiting room to get to his office.

The Government alleged Qureshi's role was to sign off on the prescriptions for Schedule II substances.  In particular, the Government alleged that Qureshi pre-signed blank prescriptions, leaving them with Ayesha when he was out of the clinic and when he was traveling out of the country.  Ayesha used the blank prescriptions to prescribe Norco and Oxy.

**B**

In February 2016, the Texas Board of Nursing, accompanied by investigators from the Drug Enforcement Administration (DEA), audited Spring Shadows.  The following day the DEA executed a search warrant, seizing the clinic's pain-patient files and computers as well as Ayesha's cell phone.

In July 2019, a grand jury returned a superseding indictment charging Qureshi and Ayesha with one count of conspiracy to dispense controlled substances unlawfully and four counts of unlawfully distributing and dispensing controlled substances.  The four substantive counts related to transactions the Government alleged occurred when Qureshi was out of the country.  Ayesha pled guilty in November 2020, and Qureshi's trial began later that month.  After a five-day trial, the jury could not reach a unanimous verdict, resulting in a mistrial.

No. 22-20328

When the four-day second trial concluded in October 2021, the district court gave the same jury charge that had been given in the first trial. For both the conspiracy and substantive counts, Qureshi objected to the lack of "any mens rea [as] to the act of distributing a drug for a legitimate medical purpose or in the usual course of professional practice." The following are excerpts from the jury charge that are relevant to this appeal.

First, the general instruction on deliberate ignorance:

> You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.

Next, the instruction for the conspiracy count:

> Title 21, United States Code, Section 846 makes it a crime for anyone to conspire with someone else to commit a violation of certain controlled substances laws of the United States. In this case, the defendant is charged with conspiring to commit a violation of Title 21, United States Code, Section 841(a)(1), which makes it a crime for any person to knowingly or intentionally distribute or dispense a controlled substance not for a legitimate medical purpose or not in the course of professional practice.
>
> A "conspiracy" is an agreement between two or more persons to join together to accomplish some unlawful purpose. It is a kind of "partnership in crime" in which each member becomes the agent of every other member.
>
> For you to find the defendant guilty of [conspiracy to violate § 841(a)(1)], you must be convinced that the government has proven each of the following beyond a reasonable doubt:

6

> *First*: That two or more persons, directly or indirectly, reached an agreement to unlawfully distribute or dispense a controlled substance not for a legitimate medical purpose or not in the usual course of professional practice;
>
> *Second*: That the defendant knew of the unlawful purpose of the agreement; and
>
> *Third*: That the defendant joined in the agreement willfully; that is with the intent to further its unlawful purpose.
>
> . . .
>
> If a defendant understands the unlawful nature of a plan or scheme and knowingly and intentionally joins in that plan or scheme on one occasion, that is sufficient to convict him for conspiracy . . . .

Last, the instruction for the substantive counts:

> Title 21, United States Code, Section 841(a)(1) makes it a crime for any person to knowingly and intentionally distribute or dispense a controlled substance not for a legitimate medical purpose or not in the usual course of professional practice.
>
> For you to find the defendant guilty of this crime, you must be convinced that the government has proven each of the following beyond a reasonable doubt:
>
> *First*: That the defendant distributed or dispensed a controlled substance;
>
> *Second*: That the defendant did so knowingly and intentionally; and
>
> *Third*: That the defendant did so other than for a legitimate medical purpose or in the usual course of professional practice.
>
> . . .
>
> A controlled substance is prescribed by a physician for a legitimate medical purpose or in the usual course of

7

professional practice, and therefore lawfully, if the substance is prescribed in good faith. A physician must act in a manner that is in accordance with the standard of care set forth in the medical community or must have a good faith basis for a deviation from the standard of care. "Good faith" in this context means an honest effort to prescribe for a patient's condition in accordance with the standards of medical practice generally recognized or accepted in the United States.

The jury found Qureshi guilty as to all counts. The district court sentenced Qureshi to sixty months as to each count to run concurrently. Qureshi timely appealed.

## II

After Qureshi's second trial but before this appeal, the Supreme Court decided *Ruan v. United States*.[9] The Court held that for a defendant to be convicted under 21 U.S.C. § 841, "once a defendant meets the burden of producing evidence that his or her conduct was 'authorized,' the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner."[10] Qureshi argues that, in light of *Ruan*, the jury instructions for both the substantive counts and the conspiracy count were erroneous because they omitted the requisite *mens rea* element.

"[W]hen the instruction is claimed to misstate an element of the offense, review is de novo, subject to harmless-error review."[11] "[S]pecific

---

[9] 142 S. Ct. 2370 (2022).

[10] *Id.* at 2376.

[11] *United States v. Ferris*, 52 F.4th 235, 239 (5th Cir. 2022) (quoting *United States v. Sanchez*, 502 F. App'x 375, 381 (5th Cir. 2012) (per curiam) (unpublished)), *cert. denied*, 143 S. Ct. 846 (2023); *see also United States v. Ajayi*, 64 F.4th 243, 247 (5th Cir. 2023) (per curiam) (determining that whether convictions under 21 U.S.C. §§ 841(a) and 846

jury instructions are to be judged not in isolation, 'but must be considered in the context of the instructions as a whole and the trial record.'"[12]  Because the omission of an element in a jury instruction is subject to harmless-error analysis,[13] "[o]ur task is to . . . determine whether a rational jury could find the Government failed to prove the omitted element."[14]

## A

We first consider Qureshi's arguments that the jury charge was erroneous.

### 1

First, Qureshi argues that the instruction for the four substantive counts was erroneous.  Qureshi was charged with four counts under 21 U.S.C. § 841(a)(1).  That statute states that "[e]xcept as authorized . . ., it shall be unlawful for any person knowingly or intentionally . . . [to] distribute[] or dispense . . . a controlled substance . . . ."[15]  The jury instructions explained that, to convict Qureshi, the jury needed to find that Qureshi "distributed or dispensed a controlled substance" and that he "did so knowingly and intentionally."  The instructions also required that the jury

---

included the proper *mens rea* element "involves statutory construction," so "our review is *de novo*").

[12] *United States v. Phea*, 755 F.3d 255, 266 (5th Cir. 2014) (quoting *United States v. Simkanin*, 420 F.3d 397, 406 (5th Cir. 2005)).

[13] *Neder v. United States*, 527 U.S. 1, 15 (1999).

[14] *United States v. Muhammad*, 14 F.4th 352, 358 (5th Cir. 2021); *see also Ferris*, 52 F.4th at 239 ("Erroneous jury instructions are harmless if a court, after a thorough examination of the record, is able to conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error." (quoting *United States v. Stanford*, 823 F.3d 814, 828 (5th Cir. 2016))).

[15] 21 U.S.C. § 841(a)(1).

find that Qureshi distributed or dispensed a controlled substance "other than for a legitimate medical purpose or in the usual course of professional practice."

The instructions did not, however, instruct the jury that it must find that Qureshi knew that he "was acting in an unauthorized manner" as required by *Ruan*.[16]  Both parties now agree that omission was error, and we concur in that assessment.  A criminal conviction must "rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt."[17]  Since the jury was not charged with finding whether Qureshi knew he was distributing controlled substances without authorization, Qureshi was convicted without the jury determining Qureshi's guilt as to that element.  When confronting pre-*Ruan* convictions, both we and our sister circuits have agreed that an instruction that omitted the *mens rea* for lack of authorization was erroneous.[18]

**2**

Next, Qureshi argues that the instruction for his conspiracy count was erroneous.  Qureshi bases his argument on two points.  First, that the conspiracy instruction was defective of its own accord because it omitted the required *mens rea* with respect to authorization, just like the instruction for

---

[16] *Ruan v. United States*, 142 S. Ct. 2370, 2375 (2022); *see also Ajayi*, 64 F.4th at 247 ("[T]he defendant must *subjectively* understand the illegitimate nature of the distribution they facilitate to commit an offense under § 841(a).").

[17] *United States v. Gaudin*, 515 U.S. 506, 510 (1995).

[18] *See, e.g.*, *United States v. Capistrano*, 74 F.4th 756, 771 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 516 (2023), *reh'g denied*, 144 S. Ct. 882 (2024); *United States v. Kahn*, 58 F.4th 1308, 1317 (10th Cir. 2023); *United States v. Ruan (Ruan II)*, 56 F.4th 1291, 1298 (11th Cir. 2023) (per curiam), *cert. denied*, 144 S. Ct. 377 (2023).

the substantive counts. Second, that the error in the substantive-offense instruction infects the conspiracy offense.

We disagree. Qureshi was charged with conspiracy under 21 U.S.C. § 846. That statute "imposes liability on anyone who 'attempts or conspires' to commit certain drug offenses."[19] "'[C]onspiracy' in the § 846 context takes the term's common-law definition," which means that "the defendant must intend to agree and must intend that a substantive offense be committed by some member of the conspiracy."[20] The conspiracy charge in this case satisfies these requirements.

To see why the conspiracy instruction was not erroneous of its own accord, it is helpful to parse it carefully. To convict, the jury needed to find that Qureshi agreed to distribute a controlled substance without authorization. Convicting Qureshi required the jury to find, in the words of the conspiracy instruction, that Qureshi "reached an agreement to unlawfully distribute or dispense a controlled substance not for a legitimate medical purpose or not in the usual course of professional practice." The "not for a legitimate medical purpose or not in the usual course of professional practice" language mirrors the regulatory standard for authorized prescriptions by medical practitioners.[21] Therefore, by convicting, the jury found that Qureshi agreed to distribute a controlled substance without authorization.

---

[19] *Ajayi*, 64 F.4th at 247 (quoting 21 U.S.C. § 846).

[20] *Id.*

[21] *Ruan*, 142 S. Ct. at 2375 ("[A]s provided by regulation, a prescription is only authorized when a doctor issues it 'for a legitimate medical purpose . . . acting in the usual course of his professional practice.'" (quoting 21 C.F.R. § 1306.04(a))); *see also* 21 U.S.C. § 829 (stating that Schedule II, III, and IV substances may not be dispensed without a practitioner's prescription).

Next, to convict, the jury also needed to find that Qureshi "knew of the unlawful purpose of the agreement." That agreement is the one referred to in the first element: an agreement to distribute controlled substances "not for a legitimate medical purpose or not in the usual course of professional practice" (i.e., without authorization). In sum, by convicting, the jury concluded that Qureshi "knew of the unlawful purpose of the agreement"— that he knew the agreement was to distribute controlled substances without authorization. Accordingly, Qureshi's conspiracy conviction satisfies § 841(a)'s requirement that the Government prove "the defendant knowingly or intentionally acted in an unauthorized manner."[22]

The Eleventh Circuit, on remand from the Supreme Court after *Ruan*, reached the same conclusion about a substantially equivalent jury charge.[23] The Eleventh Circuit reasoned that "[f]or a defendant to know that the aim of their agreement was illegal in this context means that they would need to know both that (1) they were dispensing a controlled substance and (2) that they were doing so in an unauthorized manner."[24] Thus, "if the jury concluded that the defendant did not know either of these things, then they could not conclude the defendant knew the illegal object of the conspiracy and could not vote to convict."[25] Accordingly, the Eleventh Circuit held that "the instructions for the drug conspiracy charges were not erroneous, and

---

[22] *Ruan*, 142 S. Ct. at 2376.

[23] *See Ruan II*, 56 F.4th at 1299 ("The jurors in this case were instructed to convict only if they found 'two or more people in some way agreed to try and accomplish a shared unlawful plan to distribute or dispense . . . the alleged controlled substance'" and "the defendants 'knew the unlawful purpose of the plan and willfully joined it.'").

[24] *Id.*

[25] *Id.*

any error in the substantive drug charges was harmless to these convictions."[26]  The same is true in this case.

As for Qureshi's second point, we are also not persuaded that the conspiracy conviction is erroneous just because the substantive charge is erroneous.  Although we have previously "reversed a conspiracy conviction based on an erroneous instruction in a separate but related substantive count,"[27] we have also declined to reverse a conspiracy conviction that was sufficiently "distinct" from a related and erroneous substantive instruction.[28]  This case falls into the latter category.

We recently affirmed a conviction under a jury charge that separately referred to the correct elements despite an error in a related substantive instruction because the conspiracy instruction was sufficiently distinct.  In *United States v. Fairley*,[29] a builder was convicted on three counts: one count of conspiracy to commit theft and two substantive theft counts.[30]  We held that the instructions on the substantive counts erroneously conflated two elements of the crime.[31]  With respect to the conspiracy charge, the builder argued "that because [the conspiracy count] rested on the same substantive offense as [the substantive counts], misstatements of the elements supporting [the substantive convictions] necessitate vacating [the conspiracy

---

[26] *Id.*

[27] *United States v. Fairley*, 880 F.3d 198, 212 n.17 (5th Cir. 2018) (citing *United States v. Smithers*, 27 F.3d 142, 146 (5th Cir. 1994)).

[28] *Id.* at 212.

[29] 880 F.3d 198 (5th Cir. 2018).

[30] *Id.* at 204.

[31] *Id.* at 210.

conviction]."[32] We disagreed, holding that the conspiracy count was "distinct from the substantive counts and the errors regarding [the substantive counts] therefore do not extend to cause plain error in [the] conspiracy conviction."[33] To show the distinctness of the conspiracy count from the erroneous substantive counts, we noted that both the conspiracy instruction and the verdict form pointed to the indictment, which described the elements of the substantive theft crime accurately.[34] We also noted that the Government's closing argument described the elements accurately.[35]

The conspiracy count in this case was likewise distinct from the erroneous substantive counts. The conspiracy instruction separately instructed that, to convict Qureshi of conspiracy, the jury was required to find that Qureshi willfully agreed to distribute controlled substances without authorization, and that he "knew of the unlawful purpose of the agreement." For the reasons we already explained, the four corners of that instruction capture all the elements under § 846. Further, defense counsel's accurate statement of the *mens rea* requirement in his closing argument in this case underscores the distinctness of the conspiracy count from the substantive counts. Defense counsel said that the conspiracy count

> requires that you have to join that agreement to commit an unlawful act willfully. That means that you did it with the intent to further its unlawful purpose. In other words, Dr. Qureshi would have to join with Rubeena Ayesha and say, "Hey, let's distribute some drugs illegally." That has to be his mindset, and that has to be the Government's proof.

---

[32] *Id.* at 212.

[33] *Id.* at 212-13.

[34] *Id.* at 212.

[35] *Id.* at 212-13.

That statement highlighted to the jury that a conviction for conspiracy would require the Government to prove that Qureshi agreed to distribute controlled substances knowing that doing so would be unlawful.

In support of his position, Qureshi cites *United States v. Kim*.[36]  In that case, the Ninth Circuit reversed a conspiracy conviction because the related substantive instruction failed to include the element "that the defendants knew that structuring a transaction was illegal."[37]  The instruction erroneously stated that the defendant needed only intend "to prevent a bank from reporting a currency transaction."[38]  The court reasoned that the conspiracy conviction was not saved by the conspiracy instruction's "reference to knowledge of the unlawful purpose of the conspiracy" because that "does not instruct the jury to explicitly find knowledge of the illegality of structuring."[39]  The "failure to properly instruct the jury of the knowledge requirement in the underlying offense resulted in an error in the conspiracy instruction."[40]

*Kim* is distinguishable from this case.  We read *Kim* as basing its holding on that fact that the substantive instruction misidentified what the defendant needed to know to be convicted.  The statute in that case required that a defendant know of the *illegality* of the transaction, whereas the substantive instruction stated that the defendant need only intend to *prevent a bank from reporting* a qualifying transaction.[41]  The jury's finding that the

---

[36] 65 F.3d 123 (9th Cir. 1995).

[37] *Id.* at 126.

[38] *Id.* at 125.

[39] *Id.* at 126.

[40] *Id.*

[41] *Id.* at 125-26.

defendant knew of the unlawful purpose of the conspiracy did not implicate the defendant's knowledge that the transaction was illegal.[42]  It only meant the defendant knew the agreement was to prevent a bank from reporting a qualifying transaction.[43]

In this case, both the substantive and the conspiracy instructions correctly identified what Qureshi needed to know to be convicted: that he lacked authorization to distribute controlled substances.  So, although the substantive charge erroneously omitted the *mens rea* element, the conspiracy charge directed the jury to convict only if they concluded Qureshi "knew of the unlawful purpose of the agreement."  The conspiracy charge was not infected by the substantive charge's error, and any impact on the conspiracy conviction was harmless.[44]

## B

We next consider whether the erroneous omission of the *mens rea* element in the substantive charge was harmless.  We conclude it was not.

In the context of erroneous jury instructions, if, after examining the record, we "cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—[we] should not find the error harmless."[45]  In

---

[42] *See id.* at 126.

[43] *See id.*

[44] *See Neder v. United States*, 527 U.S. 1, 15 (1999) (holding that harmlessness analysis applies to erroneous jury charges).

[45] *Id.* at 19.

performing this analysis, we do not become a "second jury."[46]  Instead, "a court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element."[47]  As we have put it, "[o]ur task is to . . . determine whether a rational jury could find the Government failed to prove the omitted element."[48]  Because we hold the § 841(a) instructions were erroneous, "the government bears the burden of showing the error was harmless beyond a reasonable doubt."[49]

The Government offers two arguments for why the error in the substantive charge was harmless.  First, it argues that the conspiracy conviction proves the jury found that Qureshi knew the prescriptions underlying the substantive counts were unauthorized.  Second, it points to the "overwhelming" evidence of knowledge presented at trial.

According to the Government, Qureshi's conspiracy conviction means the jury found knowledge as required by *Ruan*, meaning that the error in the substantive § 841(a) conviction was harmless.  In support, the Government cites *United States v. Ajayi*.[50]  In *Ajayi*, we held that any *Ruan* error in a § 841(a) instruction was harmless because the defendant conceded the conspiracy instruction was adequate and that instruction was paired

---

[46] *Id.* (quoting Roger J. Traynor, The Riddle of Harmless Error 21 (1970)).

[47] *Id.*

[48] *United States v. Muhammad*, 14 F.4th 352, 358 (5th Cir. 2021).

[49] *United States v. Patterson*, 431 F.3d 832, 837 (5th Cir. 2005) (citing *United States v. Pineiro*, 410 F.3d 282, 285 (5th Cir. 2005)).

[50] 64 F.4th 243 (5th Cir. 2023) (per curiam).

"with an instruction consistent with *Pinkerton v. United States*.[51]"[52]  But in this case, the instruction did not include a *Pinkerton* charge.  The jury in this case was not tasked with considering whether the "predicate § 841(a) offenses occurred in furtherance of the alleged § 846 conspiracy for which [Qureshi] was convicted."[53]

Further, even though the conspiracy conviction required the jury to conclude that Qureshi knew he was agreeing to distribute a controlled substance without authorization, that does not mean that Qureshi knew the particular transactions underlying the four § 841(a) counts were unauthorized.  As the indictment and verdict form highlight, each § 841(a) count alleged Qureshi distributed controlled substances without authorization to identified patients around specified dates.  Although the Government proved Qureshi pre-signed those prescriptions, which were issued when he was out of the country, Qureshi testified that pre-signing prescriptions was common practice among physicians and that he thought that practice was authorized.  Therefore, we cannot conclude the conspiracy charge proves beyond a reasonable doubt that a properly instructed jury would have concluded Qureshi knew those particular transactions were unauthorized.

That brings us to the Government's second argument: that the evidence of Qureshi's knowledge for the § 841(a) counts was overwhelming.  The Government makes several points it contends demonstrates Qureshi knew he was prescribing controlled substances without authorization.  First,

---

[51] 328 U.S. 640 (1946).

[52] *Ajayi*, 64 F.4th at 248.

[53] *See id.* (affirming a conspiracy conviction involving a jury charge that included a *Pinkerton* instruction).

in light of Qureshi's admitted knowledge that Ayesha could not prescribe Schedule II controlled substances, Qureshi's claim that he believed he was authorized to pre-sign prescriptions is not credible.  Second, it claims Qureshi knew that Ayesha disregarded the measures Qureshi claimed he put in place to ensure patients were legitimate, including urinalysis tests and limits on the number of patients.  Third, the Government argues that Qureshi either (1) did not review patient files, which would mean his prescriptions were unsupported, or (2) did review the files, which would have shown Qureshi there was no basis to approve his prescriptions.

Further, the Government identifies facts Qureshi knew that it contends would lead anyone to know Spring Shadows was not operating in the usual course of professional practice.  People lined up outside Spring Shadows before it opened, money was exchanged in the parking lot, and the waiting room was often full and smelled like marijuana and body odor.  The clinic only accepted cash, not insurance, for pain patients, and Qureshi set different fees for patients seeking Norco and Soma and patients seeking Oxy.  Spring Shadows's intake form asked patients if they were undercover officers.  Based on a sample of files reviewed by the Government's expert, ninety-six percent of visits resulted in Norco and Soma prescriptions, and all these prescriptions were for the highest available doses.  The Government's expert also concluded that the prescribed quantities "did not make mathematical or medical sense."  The Government even highlights Qureshi's explanation for the unusual prescription quantities: he testified that Ayesha wanted to misdirect patients to keep them from "communicating among themselves" about "a specific amount of medicine that they're getting," which Qureshi thought "made sense."  Finally, Qureshi did not respond to Ayesha informing him that Spring Shadows was inundated with patients seeking pills after other pain management clinics closed.

Qureshi has a different view of the evidence. He testified that his understanding was that pre-signing prescriptions was authorized and that APRNs could conduct face-to-face examinations on behalf of supervising physicians. As for the Government's assessment of Spring Shadows's patient files, Qureshi responds that the Government expert "only reviewed 24 files out of over 8,000 seized and all of those were literally handpicked by the Government."

Qureshi also disputes his knowledge of some of the unusual aspects of Spring Shadows's practice. Qureshi arrived at the clinic after it opened, so he might not have seen the line outside the door before it opened. Qureshi also presented evidence that the parking lot could not be seen from inside the clinic, which might have kept him from seeing money changing hands. With respect to the appearance of those arriving at Spring Shadows, Qureshi felt it was "a very pessimistic view of a patient, judging them on their appearance and what they're wearing or if they have a particular odor or appearance and affect." Even if a patient came in with a history of prior prescriptions from other physicians, the jury heard that the Physician's Desk Reference cautions against sudden discontinuation of opioids, including Soma. Further, Qureshi testified that he "set the market value" for visits, not prescriptions, and that he based the rate on the complexity of the visit, which was determined based on the patient's prescription history.

Considering all the evidence, the Government has not carried its burden to prove "beyond a reasonable doubt that the jury verdict would have been the same absent the error."[54] As the preceding summary of the parties' evidence reflects, Qureshi's knowledge was contested at trial. In their closing arguments, both Qureshi and the Government highlighted the

_____

[54] *Neder v. United States*, 527 U.S. 1, 19 (1999).

evidence of what Qureshi knew. Given that assessing the weight of this evidence involves making determinations of witnesses' credibility—and especially the credibility of Qureshi—we cannot say that the Government has shown "the error was harmless beyond a reasonable doubt."[55]

Furthermore, as discussed, Counts 2 through 5 asked the jury whether Qureshi distributed controlled substances without authorization on four specific occasions when Qureshi was out of the country in March 2015. A properly instructed jury could have considered Qureshi's testimony that he believed he was authorized to pre-sign the prescriptions at issue not credible. Or, it could have credited Qureshi's testimony. Determinations of the credibility of witnesses like this are "solely within the province of the jury."[56] Under these circumstances, "a rational jury could find the Government failed to prove the omitted element."[57] Accordingly, the error in the § 841(a) instruction was not harmless.

*    *    *

For these reasons we VACATE in part and AFFIRM in part Qureshi's convictions. Further, "[o]ur court's practice when one, but not all counts, within a multipart conviction has been vacated has generally been to remand to allow the district court to resentence in the first instance."[58] Consistently with that practice, we also VACATE Qureshi's sentences on all counts. We remand to the district court with these instructions:

---

[55] *United States v. Patterson*, 431 F.3d 832, 837 (5th Cir. 2005) (citing *United States v. Pineiro*, 410 F.3d 282, 285 (5th Cir. 2005)).

[56] *United States v. Michalik*, 5 F.4th 583, 592 (5th Cir. 2021) (quoting *United States v. Sanchez*, 961 F.2d 1169, 1173 (5th Cir. 1992)).

[57] *United States v. Muhammad*, 14 F.4th 352, 358 (5th Cir. 2021).

[58] *United States v. McRae*, 795 F.3d 471, 483 (5th Cir. 2015).

No. 22-20328

(1) We VACATE Qureshi's convictions for violating 21 U.S.C. § 841(a) in Counts 2, 3, 4, and 5.  We REMAND for a new trial.

(2) We AFFIRM Qureshi's conviction for violating 21 U.S.C. § 846 in Count 1.

(3) We VACATE Qureshi's sentence for all counts and REMAND for resentencing on Count 1.