RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0169p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee*,

    *v.*

RICHARD G. MAIKE (22-6114/23-5563); DOYCE
G. BARNES (22-6121/23-5561); FARADAY
HOSSEINIPOUR (23-5029/5560),

                *Defendants-Appellants*.

Nos. 22-6114 /6121 /23-5029 /5560 /5561 /5563

─────────────────

Appeal from the United States District Court for the Western District of Kentucky at Owensboro.
No. 4:17-cr-00012—Gregory N. Stivers, District Judge.

Argued: December 11, 2024

Decided and Filed: June 26, 2025

Before: McKEAGUE, KETHLEDGE, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Kyle Singhal, HOPWOOD & SINGHAL PLLC, Washington, D.C., for Appellant Richard G. Maike. R. Kenyon Meyer, DINSMORE & SHOHL LLP, Louisville, Kentucky, for Appellants Doyce G. Barnes and Faraday Hosseinipour. Tyler Anne Lee, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Kyle Singhal, HOPWOOD & SINGHAL PLLC, Washington, D.C., for Appellant Richard G. Maike. R. Kenyon Meyer, DINSMORE & SHOHL LLP, Louisville, Kentucky, for Appellants Doyce G. Barnes and Faraday Hosseinipour. Tyler Anne Lee, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Amanda E. Gregory, UNITED STATES ATTORNEY'S OFFICE, Louisville, Kentucky, for Appellee.

      KETHLEDGE, J., delivered the opinion of the court in which McKEAGUE and NALBANDIAN, JJ., concurred. NALBANDIAN, J. (pp. 15–34), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

KETHLEDGE, Circuit Judge.  The defendants here were leading figures in a company called Infinity 2 Global, which the FBI later concluded was a pyramid scheme.  The company extracted some $34 million from investors who paid to join the scheme, nearly all of whom lost money.  After a 25-day trial, a jury convicted Richard Maike, Doyce Barnes, and Faraday Hosseinipour of both conspiracy to commit mail fraud and conspiracy to commit securities fraud.  These defendants now offer some three dozen reasons to reverse their convictions.  We reject all their arguments and affirm.

I.

A.

By way of background, this case is about a fraudulent scheme, specifically a pyramid scheme.  The nature of a pyramid scheme is to consume its own participants.  These schemes usually take the form of a "multilevel marketing" organization, which can be a legitimate business arrangement.  *See, e.g., In re Amway Corp.*, 93 F.T.C. 618 (1979).  But a pyramid scheme lacks sufficient outside revenue—say, from product sales—to repay the investments of most participants.  Its revenue, rather, comes mostly from within, in the form of payments by recruits to participate in the scheme itself.  *See In re Koscot Interplanetary*, 86 F.T.C. 1106 (1975). Participation often brings the right to sell various products—music, jewelry, software— which are usually mediocre and overpriced.  *United States v. Gold Unlimited*, 177 F.3d 472 (6th Cir. 1999); *FTC v. BurnLounge, Inc.*, 753 F.3d 878 (9th Cir. 2014).  Those are a feint, meant to deceive recruits and regulators alike.  *Koscot*, 86 F.T.C. at *58.  More important is the right to earn rewards for recruiting new participants—and thus to receive a share of the scheme's primary source of revenue.  These schemes survive only as long as their recruitment revenue does; and so their incentives always emphasize recruitment over product sales.  *Gold Unlimited*, 177 F.3d at 480.  Yet the scheme's architects invariably seek to conceal its nature, in part by the façade of product sales, in part by elaborate systems of tiers, fees, and bonuses—what the district

court in one case called "a labyrinth of obfuscation." *BurnLounge*, 753 F.3d at 883. Pyramid schemes are thus merely a subset of what federal law calls schemes to defraud.

B.

1.

In February 2013, Richard Maike incorporated Infinity 2 Global (I2G), which he said would use network marketing—sometimes known as multilevel marketing—to sell digital products to consumers. In addition, the company created an online casino (operated by a third party), where persons outside the United States (but not inside) could place bets. Doyce Barnes was the company's vice president for sales, Maike its president. Neither had any apparent background in software: before the I2G venture, Maike sold nutritional supplements through multilevel marketing, and Barnes sold jewelry. In March 2013, Barnes prepared a spreadsheet with revenue projections for I2G. Those projections showed the company grossing more than $30 million by year's end, with every dollar coming from payments by participants—called "distributors"—in the scheme itself.

That summer, Maike and Barnes began recruiting distributors for I2G, who could buy into the scheme at one of four levels. The bottom three were "Novice," "Player," and "High Roller," which participants could join for an up-front payment of $100, $400, and $600, respectively. Other mandatory fees ran from $300-$900 per year. Participants at those levels could earn recruiting bonuses and, in theory, commissions for selling the "I2G Touch"—an unfinished social-media platform whose development the company had outsourced to one Rocky Wright. But most participants joined at the "Emperor" level, which cost $5,000 for the first year and $2,400 per year thereafter. Emperors could earn larger recruitment bonuses (subject to a byzantine and sometimes changing network of rules), along with (again in theory) commissions for software sales. In addition, unlike lower-level distributors, Emperors were entitled to a pro-rata share of I2G's profits from the online casino.

Two early recruits to the scheme were Richard Anzalone and Faraday Hosseinipour, who worked as partners and had ample experience with multilevel marketing. Together they bought four Emperor packages, which entitled them to four pro-rata shares of the casino profits. They

also agreed to join I2G's inner circle, helping to develop strategies to enlist new recruits. Part of that strategy was a series of in-person conferences that I2G held during the fall of 2013. At these conferences, I2G's leadership—including Maike, Barnes, Anzalone, and Hosseinipour—pitched their audiences about the commissions (*i.e.*, recruitment fees) and casino revenue they could receive as Emperors. They also depicted the software in the company's pipeline—the "Touch" social-media platform, and a music platform called "Songstergram"—as revolutionary. At three of these conferences, Anzalone and Hosseinipour (among others) held up oversized, six-figure checks in front of their audiences, sometimes for amounts they never received.

At another conference, Rocky Wright appeared onstage to talk about the company's pending software products. But I2G's leadership introduced him to the audience as "Bob Johnson"—because Wright's software firm had recently declared bankruptcy, and the company feared that audience members might look him up. Also unmentioned was that "Touch" was a near-copy of a product that Wright's firm had offered online for free, called "Qubeey."

Meanwhile, online, Hosseinipour was especially active in recruiting new participants to the scheme. That fall, she told potential recruits that I2G would soon release Songstergram—and that musicians like Britney Spears, Justin Timberlake, and Lady Gaga had agreed to endorse it. None of those things were true. Hosseinipour also recruited new members on YouTube, posting videos of "Hangouts" in which she discussed I2G with (ostensibly) prospective distributors. In one such video, she told viewers, "Join I2G. Get your share of the 150 billion gambling pie, which is supposed to triple in the next two years." In another video, she pitched the casino this way: "Join as an emperor, and you do not have to recruit, and you do not have to gamble. Can we all say passive income?" And Maike, among other things, told prospective recruits during a conference call that "the company was offered $100 million" for its Touch software alone. That statement too was baseless.

By the end of 2013, I2G had sold 7,000 distributor packages, yielding millions in revenue for the company and its inner circle. By 2014, however, some observers had begun to see through the company's representations. The Touch software was rife with glitches and never generated any appreciable income for any of the distributors; indeed they were never even

allowed to sell it to consumers. Songstergram never launched and likewise generated zero income. And even for top-tier distributors like Anzalone, the casino was a bust. Anzalone testified that his pro-rata share of casino income had topped out around $90 for his first month as an Emperor and ran near $15-20 per month thereafter. (Meanwhile, after year one, the monthly fees for an Emperor were ten times that amount.)

In early 2014, some distributors began to contact state regulators and to threaten class-action lawsuits. By spring, as Anzalone described it, "the Internet was just really bad on I2G." Hosseinipour acted to have some of that criticism taken down. A handful of more sophisticated critics brought their concerns to I2G directly. One wrote in an email:

> after reviewing this business model, it's clear to see Infinity2Global is [relying] on new member money paying for founding member incomes. This is a classic Ponzi organization. . . . Here you have a sales organization which is banned from selling the product. . . . All three so-called products are third-party programs and are truly low quality.

Another commenter emailed Anzalone and Hosseinipour the following:

> Nowhere on the corporate site is there a product descriptions [sic] and the exact features offered by the social media platform. . . . Nowhere in the compensation document says that money is earned for the sale of products. But it says 'if you buy this package' you 'will earn this rank'. Meaning you can purchase positioning. Nowhere in the compensation plan document states that money is earn [sic] through retailing products to customers, and there is no place for a customer to purchase a product.

Maike's solution to all this criticism, in July 2014, was to change the company's name from I2G to Global 1 Entertainment (G1E). Yet the company's recruitment slowed and its revenue dried up. Near the end of 2014, I2G (now G1E) ceased operations. By that time, however, the company had reaped more than $34 million in revenue—nearly all of it (save about $500,000) paid in by the company's own distributors. Most of that money went to the company's top tier, including the defendants here. Nearly all the investors who bought into the scheme—some 96%—lost money.

2.

The FBI began investigating I2G near the end of 2014, and concluded that I2G was a pyramid scheme whose management and top-tier distributors had defrauded its lower-tier ones. A grand jury thereafter indicted Maike, Barnes, Hosseinipour, Anzalone, and two other top-tier distributors for conspiracy to commit mail fraud, in violation of 18 U.S.C. §§ 1341 and 1349, and conspiracy to commit securities fraud, in violation of 15 U.S.C. § 78j(b) and 18 U.S.C. § 371.

Anzalone took a plea deal and testified against the three defendants before us here. (The two other defendants also took plea deals.) In 2022, after a 25-day trial, a jury convicted Maike, Barnes, and Hosseinipour on both counts. Anzalone died soon afterward. Maike was sentenced to 120 months in prison, Barnes to 48 months, and Hosseinipour to 30 months. They later brought these appeals, which we have consolidated here.

II.

A.

1.

The defendants each argue that the jury lacked sufficient evidence to find them guilty of conspiracy to commit mail fraud, in violation of 18 U.S.C. §§ 1341 and 1349. When reviewing a guilty verdict, we determine only "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Here, the crime of conviction was a conspiracy offense, which means the government need not have proved that each defendant engaged in conduct satisfying each element of the underlying substantive offense (mail fraud). To prove a murder-for-hire conspiracy, for example, the government need not prove that each defendant pulled the trigger for the fatal shot. Instead, to sustain the defendants' conviction for conspiracy to commit mail fraud here, the government must have proven that each of them agreed (with at least one other person) to

commit mail fraud, and did so knowingly and voluntarily.  *See* 18 U.S.C. § 1349; *United States v. Rogers*, 769 F.3d 372, 382 (6th Cir. 2014).

So we consider the government's evidence on these points.  Sometimes the easiest way to prove agreement is by action:  that one defendant or another engaged in conduct satisfying each element of a substantive offense—along with circumstantial evidence that they did so pursuant to a plan they all shared in common—is proof enough that they conspired to commit it.  *See United States v. Faulkenberry*, 614 F.3d 573, 584 (6th Cir. 2010).  Two robbers who enter a bank from different entrances, for example, presumably do not do so by coincidence.

Evidence of conduct amounting to fraud is what the government offered here.  Mail fraud has three elements:  the defendant must devise or knowingly participate in a scheme to defraud; the defendant must do so with the intent of depriving a victim of money or property; and the scheme must in some way use the mail.  *United States v. Turner*, 465 F.3d 667, 680 (6th Cir. 2006); *Rogers*, 769 F.3d at 380.

Here, at trial, the government presented abundant proof that the defendants knowingly participated in (and in Maike's case devised) a fraudulent scheme.  "A scheme to defraud is any plan or course of action by which someone intends to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises."  *Faulkenberry*, 614 F.3d at 581 (cleaned up).  I2G's business plan—and its elaborate system of fees and rules for distributor compensation—was undisputedly a "plan or course of action."  And the government presented overwhelming evidence that the defendants employed that plan to deprive others—namely, lower-level distributors—of money by means of lies and fraudulent representations.  For example, Barnes's projections of the company's revenue were based 100% on payments from distributors, with zero projected income from outside sources.  Maike lied to prospective recruits about the casino's monthly profits; and after monthly payouts to Emperors dropped to circa $17 per month and stayed there, the reality (a jury could easily infer) was that these defendants knew that Emperors would not recoup their investments from casino revenues.  Maike also lied about the company having been offered $100 million for the Touch software alone.  The defendants also knew, but concealed from prospective recruits, that Touch was nearly identical to a product

that Rocky Wright's (bankrupt) firm had offered online for free. The defendants (or at least one of them—the record does not make clear who) also lied to conference attendees by introducing Rocky Wright as "Bob Johnson." Hosseinipour misrepresented to prospective recruits that "passive income" would allow them to recoup their investments without any recruitment of new members on their part. Barnes made the same misrepresentation to prospective recruits in an October 2013 conference call, telling them they could just "sit on the couch" and make money on the casino. Hosseinipour lied about celebrity endorsements of Songstergram (claiming that even Prince had "signed up"). The defendants also misrepresented to conference attendees the amounts that Anzalone and Hosseinipour received as distributors, by having them display oversized six-figure checks for amounts they did not receive. And Anzalone testified that he discussed with Hosseinipour the more sophisticated observers' criticisms of I2G—including that it was a "Ponzi organization"—and that he thought those criticisms were "valid." Yet the duo continued to recruit new victims. Moreover, when another distributor accused I2G of running a pyramid scheme, Hosseinipour was unequivocal about what the company should do: "There is no alternative except to bury him."

The results of the I2G scheme also supported an inference that it was fraudulent, rather than (as the defendants argue here) just star-crossed. The scheme yielded more than $34 million in revenue for the company, nearly all of it extracted from the participants themselves; 96% of participants lost money; and the defendants themselves reaped millions. The evidence therefore allowed the jury to infer not only that these defendants knowingly and voluntarily agreed to participate in a fraudulent scheme—namely a pyramid scheme—but that they actually did so, thereby obtaining millions of dollars in profits for themselves. The government presented sufficient evidence for the jury to convict these defendants of conspiracy to commit mail fraud.

2.

a.

The defendants also challenge the district court's jury instructions concerning mail fraud. We review challenges to jury instructions for an abuse of discretion, though we review the instructions' legal accuracy de novo. *United States v. You*, 74 F.4th 378, 391 (6th Cir. 2023).

The defendants first argue that the court's instructions as to mail fraud (Instruction 8) allowed the jury to circumvent a finding that they participated in a "scheme to defraud," which is the first element of the substantive offense of mail fraud. The instructions provided that a "'scheme to defraud' includes any plan or course of action by which someone intends to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." Instruction 8(2)(A), Pg. ID 5265. The instructions also defined a "pyramid scheme" (to paraphrase here) as one in which "the focus is on promoting the sale of interests in the venture rather than the sale of products[.]" *Id.* 8(2)(B), Pg. ID 5265-66. In that definition, the fraud is implicit—any such scheme is doomed to fail—rather than explicit; and the court further instructed that a "pyramid scheme constitutes a scheme or artifice to defraud for purposes of this instruction." *Id.* Thus—the defendants rightly observe—in the jury's mind, a finding that defendants participated in a pyramid scheme could substitute for a finding that they participated in a fraudulent scheme. And the court's definition of a pyramid scheme, as noted above, did not require the jury expressly to find that it was fraudulent.

But that narrow substitution—"pyramid scheme" for "scheme to defraud," as respectively defined by the court—did not allow the jury to elide the question whether the defendants participated in a fraudulent scheme with fraudulent intent. In reviewing challenges to jury instructions, we consider the instructions as a whole. *United States v. Kuehne*, 547 F.3d 667, 679 (6th Cir. 2008). And here the relevant instructions, considered as a whole, were duplicative enough to require the jury to consider that question.

As an initial matter, the offense of conviction was conspiracy to commit mail fraud; and so (as discussed above) what the jury needed to find was that the defendants voluntarily *agreed* to commit the crime of mail fraud, not that they actually committed it. (Evidence that they committed that crime, rather, was proof that they had agreed to commit it.)

Meanwhile, to reiterate, the court instructed the jury that a "'scheme to defraud' includes [i] any plan or course of action [ii] by which someone intends to deprive another of money or property [iii] by means of false or fraudulent pretenses, representations, or promises." (Brackets added.) Hence that instruction had three components. The first component—the existence of a

plan or scheme—was likewise part of the court's definition of a pyramid scheme (as "any plan, program, device," etc.). Instruction 8(2)(B), Pg. ID 5265. That aspect of the pyramid-scheme instruction thus did not lead the jury astray. Meanwhile, the second component of the "scheme to defraud" instruction—that the scheme be one "[ii] by which someone intends to deprive another of money or property"—was more than covered by another part of Instruction 8, namely subpart (1)(C). That subpart required "that the defendant had the intent to defraud" when he participated in the scheme. And the third component—that the scheme employed "false or fraudulent pretenses, representations, or promises"—is covered by subpart (1)(B) of Instruction 8, which required that "the scheme included a material misrepresentation or concealment of a material fact[.]"

Even if the jury found a pyramid scheme, therefore, the court's Instruction 8 directed the jury to make a finding as to every component of a scheme to defraud. Nor, for that same reason, did the supposed breadth of the court's definition of a pyramid scheme make any difference here. We therefore reject the defendants' arguments on these points.

We do note, however, that the district court's instruction as to pyramid schemes served little purpose here. Unlike many state laws, federal law does not proscribe pyramid schemes specifically. Instead it proscribes schemes to defraud, of which pyramid schemes are a subset. Meanwhile, the definition of a scheme to defraud is straightforward; the definition of a pyramid scheme is abstruse. And what ultimately matters, in a federal criminal prosecution for fraud, is whether the defendants participated in a scheme to defraud.

b.

The defendants argue that the court abused its discretion by rejecting their request for a jury instruction about an affirmative defense of "anti-saturation." A defendant is entitled to an instruction about an affirmative defense only when that defense finds "some support in the evidence and in the law." *United States v. Johnson*, 416 F.3d 464, 467 (6th Cir. 2005).

Saturation, for purposes of a pyramid scheme, occurs when participants at the lowest level of a pyramid cannot find new recruits—and thus cannot recoup their investment in joining the scheme. *See Gold Unlimited*, 177 F.3d at 481. The defendants say they prevented the

scheme here from reaching saturation because they capped the number of Emperors at 5,000. In both theory and in fact, however, this argument is meritless. As to theory, the cap merely created an artificial point of saturation—because the last Emperors to join, before reaching the cap, would not themselves be able to recruit new Emperors. And in fact the cap had no effect—because the number of Emperors never reached 5,000 (at any point in time) before I2G ceased operations.

More to the point, no "anti-saturation" measure can cure misrepresentations that induced people to buy into a scheme under false pretenses. And here, as shown above, these defendants made many such misrepresentations. Their anti-saturation instruction would have only confused the jury, and the district court was right to reject it.

B.

The defendants challenge the sufficiency of the evidence to convict them of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 and 15 U.S.C. § 78j(b). Specifically, they argue that the government lacked evidence that I2G's Emperor packages were securities.

As an initial matter, the Supreme Court has treated that question—whether an instrument is a security—as a question of fact for "the jury" to decide. *S.E.C. v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 355 (1943). And that is how the parties here treated this question in the district court, not least in their proposed jury instructions for this count at trial. Gov't Proposed Instruction 5; Defs. Response to Proposed Jury Instructions, Pg. 5. We therefore review whether "any rational trier of fact could have found" the Emperor packages to have been a security. *Jackson*, 443 U.S. at 319.

"Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and in whatever form they are called." *S.E.C. v. Edwards*, 540 U.S. 389, 393 (2004) (cleaned up). "To that end, it enacted a broad definition of 'security,' sufficient to encompass virtually any instrument that might be sold as an investment." *Id.* (cleaned up). Here, the government contended at trial that the Emperor packages were investment contracts.

Whether "a particular scheme is an investment contract" depends on "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id*. Here, Emperors paid $5,000 (and $2,400 per year after the first year) for each Emperor package they chose to buy. That satisfied the element of "an investment of money." *Id.*

A "common enterprise," in turn, "requires a sharing or pooling of funds." *Union Planters Nat'l Bank of Memphis v. Commercial Credit Business Loans*, 651 F.2d 1174, 1183 (6th Cir. 1981). It also requires commonality in the sense that the success of each investor is tied "to the success of the overall venture." *Id*. Here, Emperors paid into a common pool—I2G's bank account—and the company in turn paid a third-party vendor to operate the casino. And the income received by each Emperor was tied to the casino's success: every Emperor received the same pro-rata share of the casino's profits for each Emperor package he purchased. The Emperor packages thus amounted to stakes in a common enterprise.

Next, the investors' profits from that enterprise must have come "solely from the efforts of others." *Edwards*, 540 U.S. at 393. That was true here. Hossienipour, among others, repeatedly emphasized that the casino income was "passive income" for Emperors; to receive it, they needed only to purchase the package. As Hosseinipour said, "You don't even have to gamble. You don't have to recruit at the emperor level." Barnes made the same representation in the October 2013 conference call to potential investors, when he described the casino revenue as "a passive position, that anyone can come in and share in the pool equally for one year." He added, "there's nothing they gotta do except sit there and draw their money from the pool." Maike, who was on the same call, said nothing. So for Emperors the casino profits (such as they were) came from the efforts of others. Thus, when one considers the entitlement to casino revenue in isolation, the Emperor package was an archetypal investment contract—and thus a security.

But the defendants argue that the Emperor package loses that character when considered together with the possibility of recruitment bonuses. Whether an investment is a security depends on the transaction as a whole. *International Brotherhood of Teamsters v. Daniel*, 439

U.S. 551, 559 (1979). Emperor packages cost $4,400 more than the next level of distributorship beneath them. That premium entitled Emperors alone to a pro-rata share of the casino profits. But Emperors also earned greater rewards than lower-level distributors did for each new recruit they brought into the scheme. The "interest acquired" by Emperors for that premium thus "intermingled security and nonsecurity aspects." *Id*. at 560.

Given that intermingling, the Emperor packages were securities if they contained "to a very substantial degree elements of investment contracts." *Id*. (cleaned up). And on that point the evidence at trial was straightforward. Emperors were free to buy more than one such package; Anazalone testified that some Emperors did so, and that he and Hosseinipour indeed bought four (before they realized how minimal the casino income would be). But an Emperor obtained the full "nonsecurity" benefit of an Emperor package—the more generous formula for recruitment rewards—with the purchase of only one such package. Thus, as a government expert explained to the jury at trial, the only reason to buy additional Emperor packages was to obtain additional shares of the casino's profits. That some investors (including Anazalone and Hosseinipour) bought those additional packages, therefore, was strong evidence that investors saw the security aspect of Emperor packages—the casino profits—to be "very substantial." *Id.* And at trial ten witnesses testified unequivocally that they each bought an Emperor package solely because of the share of casino profits that came with it—without any intention of recruiting new participants to the scheme.

Finally, in deciding whether an instrument is a security, the Court considers the seller's representations about it—"the economic inducements held out to the prospect." *Joiner*, 320 U.S. at 353. Here, as described above, the defendants represented to prospective recruits again and again that the casino income, standing alone, would be enough for them to make a profit on their investment. And as Anazalone testified at trial, the "exciting part of [I2G] was, and what got us going, was the rev—the, excuse me, profit sharing of the—of the casino. That's what really got the program going. . . . [M]any people believed, you know, I get—I need to get as many shares as possible, because this thing could be huge."

In *Joiner*, the Supreme Court said that "[i]n the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be." *Id*. That is what the jury found here. The jury had ample grounds to find that the Emperor packages were securities and thus that the defendants were guilty of conspiracy to commit securities fraud.

\*     \*     \*

The criminal judgments of Maike and Barnes are affirmed. We also affirm Hosseinipour's criminal judgment; except that, as described in our unpublished opinion, we vacate the district court's denial of her Rule 33 motion for a new trial, and remand her case for the limited purpose of deciding that motion anew.

——————————

**CONCURRENCE**

——————————

NALBANDIAN, Circuit Judge, concurring. I concur fully in the published and unpublished opinions. I write separately to address a couple of issues that I think are left unresolved in the majority opinion.

The main issue concerns the fraud convictions. The indictment illustrates, and the jury instructions confirm, that the government pursued two fraud theories—I2G was either a generic fraud or a pyramid scheme. The majority explains why sufficient evidence supports the conspiracy convictions on a general-fraud theory. I agree. But the indictment, the evidence at trial, the expert testimony, the government's closing arguments, and the jury instructions all show that the government also leaned heavily into the theory that I2G was a pyramid scheme. And why wouldn't they? Succeeding on that theory was a shortcut of sorts in its burden of proof.

The jury was instructed that it could find I2G was either a pyramid scheme or a general fraud. But we don't have a special verdict form explaining which the jury picked. If this were only about sufficient evidence, then we could affirm on the general-fraud theory alone. *Griffin v. United States*, 502 U.S. 46, 58–60 (1991). But I think the defendants separately argue that the government presented an erroneous *legal theory*—an Emperor-only capped pyramid. They claim that the indictment, the proof at trial, and the jury instructions all reflect this error. If true, then proof of the general fraud is not enough to affirm their convictions. *Id.* Jurors aren't "equipped to determine whether a particular theory of conviction submitted to them is contrary to law." *United States v. Kurlemann*, 736 F.3d 439, 449–50 (6th Cir. 2013) (quoting *Griffin*, 502 U.S. at 59).

Still, I would find that the defendants' argument fails on the facts of this case. I believe the government did not indict and did not prove a capped pyramid. And any reference to the Emperors in the jury instructions was harmless. So I'd affirm their convictions.

**I.**

The days of the traveling salesman are largely behind us, but one vestige remains. Multi-level marketing is a type of organizational structure that allows a company to leverage the low-cost and potential yield of an entrepreneurial team of salesmen without the overhead of retail locations. These companies—MLMs—also leverage financial incentives for their salesmen who both recruit new members and sell products (or services). But an MLM runs into legal trouble if it under-incentivizes product sales and over-incentivizes recruiting. When that happens, a legal MLM becomes an illegal pyramid scheme.

Anyone with access to the internet in the early 2000s knows why: chain-letter emails cause the same problem, just with fewer financial consequences. For those unfamiliar, you'd get an email that directs you to "forward this to 5 new people or you'll have bad luck for the next 10 years." A quick look at the math highlights the problem. If the first person sends it to five people and they all forward it to five people each, suddenly thirty people have received the email.[1] This is the start of exponential growth. And with exponential growth, very soon, at least in theory, a final layer of people—those who received the email last—will be left holding the bag. That is, they'll receive the email, have no one to forward it to who hasn't already seen it, and presumably be stuck with ten years of bad luck.

A financial scheme whose core financial reward is tied to recruiting new members leads to the same result. Eventually the scheme must fail and when that happens, the final and largest layer of recruits is left with a guaranteed loss. So because these pyramid schemes will always result in a financial loss to the individuals who are last to join, courts have concluded that they are inherently fraudulent. *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 479 (6th Cir. 1999); *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 781 (9th Cir. 1996). But courts and

---

[1]You can visualize this growth in tiers of an ever-widening pyramid. At the top you have the origin of the email chain: person zero. At the next level, are the first 5 people that receive the email. At the next, 25. At the next, 125. The math is straightforward: the size of each level of the pyramid is reflected in the equation $5^X$ where x is the level of the pyramid. So at the first level: $5^1=5$. At the second: $5^2=25$. At the third: $5^3=125$. At the fourth: $5^4=625$. At the fifth: $5^5=3,125$ and so on. As each level grows, the scale of the pyramid's fraud also grows because with each new level its reach exceeds the total headcount of the layers above it. So when this pyramid has five levels, the sum of the first four levels (5+25+125+625=780) is less than the fifth level alone (3,125).

legislatures recognize that illegal pyramids share features with legal MLMs, like Amway. *In re Amway Corp.*, 93 F.T.C. 618 (1979). And because entrepreneurial market activity is beneficial, we must distinguish between the two. *Gold Unlimited*, 177 F.3d at 480 (collecting sources recognizing the importance of distinguishing between the two).

Still, distinguishing between them isn't always straightforward and requires a comprehensive look at the scheme's organization, marketing practices, and incentive structures. Synthesizing these ideas, the Federal Trade Commission originally condemned pyramids as a deceptive trade practice under Section 5 of the Federal Trade Commission Act. 15 U.S.C. § 45. It explained that these schemes:

> are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product *and* (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users.

*Omnitrition*, 79 F.3d at 781 (quoting *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1180 (1975)). This second factor is the *sine qua non* of a pyramid scheme, because the scheme is simply an "elaborate chain letter" premised on unlimited recruiting that leads to saturation. *Gold Unlimited*, 177 F.3d at 481 (quoting *Omnitrition*, 79 F.3d at 781); *see also id.* ("*Koscot*'s second factor—that an illegal pyramid rewards participants for recruitment, not for sales—implies that saturation must occur.").

The Commission noted that when a scheme meets this characterization, the sale of products would be "likely to prove worthless for many participants" because they'd find it nearly impossible to recoup their investments through the sale of products alone. *Koscot*, 86 F.T.C. at 1181. As a result, the "substantial rewards for recruiting other distributors" would prove necessary. *Id.* Thus, the Commission concluded that such schemes involved "inevitably deceptive representation[s]" on the participant's ability to recover his investment. *Id.*

All of this comes from the context of civil FTC enforcement. But courts have since concluded that pyramid schemes are not only deceptive (under Section 5) but also fraudulent (under civil antifraud statutes). *Webster v. Omnitrition* highlights this shift. 79 F.3d at 782. And in the process, the Ninth Circuit took what the FTC had described as the "characteriz[ation]" of a

pyramid scheme and created a two-part test: "We adopt the *Koscot* standard here and hold that the operation of a pyramid scheme constitutes fraud . . . ." *Id.* at 782.

Then, in *United States v. Gold Unlimited*, we extended *Koscot* to criminal mail fraud, albeit with some added nuance. Relevant here, *Gold Unlimited* did two key things. First, we approved an instruction that mirrored *Koscot*'s and *Omnitrition*'s characterizations of pyramid schemes. *Gold Unlimited*, 177 F.3d at 479–84 (citing *Koscot*, 86 F.T.C. at 1187 and *Omnitrition*, 79 F.3d at 781–82). Gold Unlimited had contended that the instruction was incomplete because it didn't specifically tell the jury that a company could establish anti-saturation policies to avoid being an illegal pyramid scheme. *Id.* at 482. But we rejected that view; when the government proves the second *Koscot* factor, there is an "impli[cation] that saturation must occur." *Id.* at 481; *see also id.* at 482 ("Given the grave risks imposed on investors in illegal schemes, the government should have to do no more than prove that the program satisfies the definition of *Koscot*.").

Still, we recognized that a defendant can rebut that implication by carrying the burden "of establishing that it has effective anti-saturation programs." *Id.* at 482. As for Gold Unlimited, it had failed to both request the relevant anti-saturation instruction and to show that it merited one on the record. *Id.* But we left open the possibility that future defendants could prove that they had established policies that "de-linked" recruitment from commissions sufficient to warrant an affirmative defense. *Id.* at 481–82. We also recognized the possibility that "prudent district courts might supplement the *Koscot* test to reflect the difference between legitimate multi-level marketing and illegal pyramids and Ponzi schemes." *Id.* at 483. In so doing, we noted that many states only prohibit schemes that "primarily" compensate participants for recruitment rather than sales. *Id.*

The second major thing that we did in *Gold Unlimited* was hold that a court may instruct a jury that a "pyramid scheme constitutes a scheme or artifice to defraud" under the mail-fraud statute. *Id.* at 478, 484. In other words, a jury's finding that there was a "pyramid scheme" becomes a shortcut for the government's proof of mail fraud. Once the jury finds a pyramid,

the only thing left for the government to prove is that the defendants used the mails to perpetuate their scheme.

## II.

## A.

With this framing in mind, the first issue concerns the scope of the alleged "pyramid scheme." Was the government's theory that all I2G was a pyramid, or was it just a pyramid of Emperors? The answer hinges on the indictment. And when we look at the indictment, we look at it as a whole because, like a constructive amendment or a prejudicial variance, the whole indictment colors whether the defendant was on notice of the charges against him. *United States v. Sittenfeld*, 128 F.4th 752, 774–75 (6th Cir. 2025) ("Any change to the indictment outside of [the Grand Jury] implicates other, related constitutional concerns—the defendant's Fifth Amendment protection from double jeopardy and Sixth Amendment right to notice of the charges against him."); *cf. id.* at 781 ("[W]e read indictments as a whole, and can consider the full scope of the indictment to analyze whether the trial evidence varied from the indictment." (cleaned up)). The real question here is whether the defendants were on notice to defend against an I2G-pyramid rather than an Emperor-only pyramid. So I look at the whole indictment, including the manner and means and the government's "specification of the ways in which the defendant sought to accomplish his crime." *Id.* at 781 (cleaned up).

The government's second superseding indictment alleges two things: a general theory of fraud and a pyramid scheme. Both extend to I2G as a whole. A point the first paragraph of the indictment makes clear: "[T]he defendants[] engaged in a $25 million dollar fraudulent pyramid scheme, *operating under the name Infinity 2 Global or I2G (hereinafter "I2G")*, by representing that investors would receive a return on investment based upon an online internet gaming site called i2gcasino.com." R.230, Second Superseding Indictment, PageID 1452 (emphasis added).

The next paragraph alleges the same. The defendants "falsely represented that *I2G* was generating massive profits from its online internet gambling site and that the public could share in such profits through the purchase of a $5,000 'Emperor' position in *I2G*." *Id.* at 1452–53 (emphasis added). And again: "*I2G* was operating as a fraudulent pyramid scheme in which

inflated returns were paid to early promoters in order to induce later victim-investors to invest in the company." *Id.* (emphasis added).

It's true that these examples also show that the Emperors were central to the indictment, in part because the alleged securities fraud only extended to the Emperors. But that didn't divorce Emperors from the larger I2G fraud, which is why the indictment repeatedly refers to "I2G" not just Emperors. *Id.* at 1454–57, ¶¶10, 15, 17–18. This isn't a no-brainer, but in the absence of a to-wit clause, and given the overarching structure of I2G, separating the Emperors from the rest of the scheme is illogical. *Cf. United States v. Lee*, 919 F.3d 340, 349 (6th Cir. 2019) (noting that an indictment's factual allegations should be construed "in a practical sense with all the necessary implications" (internal quotation marks omitted)); *United States v. Bowker*, 372 F.3d 365, 376 (6th Cir. 2004) ("Courts utilize a common sense construction in determining whether an indictment sufficiently informs a defendant of an offense." (internal quotation marks omitted)), *abrogated on other grounds by United States v. Booker*, 543 U.S. 220 (2005). So I think the government alleged enough to show that its two theories of fraud were based on I2G, not just the Emperors.

## B.

With the scope of the pyramid clarified, the next question is what did the government prove at trial: an Emperor-only capped pyramid, or an I2G pyramid?

The government only charged defendants with conspiracy to commit mail fraud rather than a substantive count of mail fraud. To prove a conspiracy the government did not have to also prove the individual elements of the substantive offense. *United States v. Phillips*, 872 F.3d 803, 806 (6th Cir. 2017) (citing *Salinas v. United States*, 522 U.S. 52, 65 (1997)). But the jury must be instructed on, and "unanimously agree on," one object. Pattern Crim. Jury Instr. 6th Cir. 3.01A (2025). Here, the only alleged object was mail fraud.

Mail fraud rests on a scheme-to-defraud. 18 U.S.C. § 1341. Normally the government establishes such a scheme by proving that the defendant intended to defraud and deprive another of money, and that he made material misrepresentations to do so. *United States v. Daniel*,

329 F.3d 480, 485–86 (6th Cir. 2003). But, as I noted above, if a jury finds a pyramid scheme, it necessarily finds a scheme to defraud.[2] *Gold Unlimited*, 177 F.3d at 484.

So looking at the evidence at trial, the question becomes whether the government proved that *I2G* would grow endlessly because purchasers could only recoup their investments by recruiting others for money unrelated to product sales. I think the answer is plainly yes—I2G's promotional materials, among other things, make clear it operated as an illegal pyramid scheme.

Maike created I2G based on a "binary compensation system." In a binary scheme, each person is responsible for recruiting two people beneath them and so on, to develop a "downline." The "downline" is the pool from which an individual can earn commissions. It's also what generates a "pyramid": one person at level 1, two people beneath him at level 2, four people beneath them at level 3, and so on.

I2G invited people (whom they call "Independent Business Owners" (IBOs)) to join I2G. Once invested, IBOs would gain access to digital products, earn the opportunity to recruit new members, and—if you joined as an Emperor—earn passive income from an online casino. But a high-level overview of the bonus structure highlights how I2G was curated to encourage recruiting not to promote its products.

Every new member would join at one of four levels of membership: Novice, Player, High Roller, or Emperor. To earn commissions, any IBO needed to maintain active status by staying current on their dues. There were the up-front start up fees: an annual fee of $19.95 for access to certain software, and a "membership" fee (Novices $100, Players $400, High Rollers $600, and Emperors $5,000). Every year members had to renew their membership.

I2G promoted itself through the "Infinite Opportunity Plan," which described five ways to earn commissions: (1) Fast Start Bonuses, (2) Binary Income, (3) Matching Bonuses, (4) Leadership Pools, and (5) a Revenue Share. The Fast Start Bonus was simple. For every

---

[2]Both parties acknowledge this point. R. 692, Trial Tr. Vol. 21, PageID 10,009. As defense counsel explained: if there was a pyramid scheme, the government didn't "have to prove a particular lie." Oral Arg., 1:08:40-1:09:25 (No. 22-6114), https://www.opn.ca6.uscourts.gov/ internet/court_audio/audio/12-11-2024%20-%20Wednesday/22-6114%20USA%20v%20 Richard%20Maike.mp3; *id.* at 1:09:30–1:09:50 ("[P]yramid is a surrogate for everything except use of the mails.").

member an IBO enrolled, he'd earn a flat 10% on the initiation fee. So if he recruited a Novice, he'd earn $10 (10% of $100). No sale of products necessary.

"Binary Income" was I2G's version of rewards points. For example, I2G gave IBOs credit for every new member he recruited in "business volume" (BV). For every new member the IBO recruited, he'd earn BV based on the level the new member entered at: New Novices would earn his recruiter 60BV, Players 240BV, High Rollers 260BV, and Emperors 3,000BV.

Once an IBO earned enough BV he'd get "cash back." Remember, Maike formed I2G based on a binary scheme, so each person was responsible for recruiting two people—one on his right "side" and another on his left "side." If he earned 300 BV on both sides (so 600 BV total), he'd complete one cycle and could earn cash back. And new recruits were attributable to the IBO even if they were several "levels" down in the pyramid. That meant an IBO could still earn BV from a new member recruited ten or fifteen levels beneath him.[3] Again, no sale of products necessary.

The Leadership Pools were the final recruitment bonus. These bonuses were available to IBOs again based on binary cycles completed by his downline, but the rewards were significant. At the lowest end in the "silver pool," IBOs could earn a one-time cash bonus of $10,000. No sale of products necessary.

Unique to the Emperors was access to a revenue share in an online casino. I2G had hired a third party to manage the casino. And the managing contract split the casino's proceeds: 30% to the vendor and 70% to I2G. That 70% was split 50/50: half to I2G and half split equally among Emperors. This structure was supposed to create a passive income stream. Without any obligation to recruit, Emperors could collect revenue generated by the casino. To ensure this revenue stream wasn't diluted, I2G placed a 5,000-person cap on the number of Emperors. Still, there was no way to gain access to the casino's revenue without the start-up costs—$5,000 plus fees—*i.e.*, without joining the pyramid.

---

[3]The Star Matching Bonus was another recruitment bonus that allowed IBOs to earn commissions based on downline recruits. Again, no sale of products necessary.

I2G had also curated a unique portfolio of digital products. First, they rolled out the I2GTouch, a hybrid social media videoconferencing platform. Then Songstergram, which was pitched as a social media product to create, edit, and share original music videos. And right before I2G became defunct, they had rolled out a travel discount engine, a fantasy sports platform, a video game system, and a sports book for international users.

But these products, especially the Touch, were limited if not useless. For example, there was evidence that the Touch was never fully developed. And though the Touch wasn't functional, I2G didn't wait to start charging its members for the opportunity to access it for an added fee (from $25 for Novices up to $200 for Emperors). Beyond that, the Touch was an expensive (and defective) knockoff of Qubey—an existing, free-to-use product in the same market.

The majority says more about these products, but their relevance here is only to highlight their *ir*relevance to I2G's money-making scheme. Some products didn't work and still others were promoted based on outlandish lies—like that Britney Spears had endorsed Songstergram. Key to the pyramid-scheme determination is that these products were completely detached from I2G's incentive structure, a problem that was highlighted by their dysfunction. You could earn some BV by using Songstergram, but the real money-making was in the various recruitment bonuses. And there was no evidence of Touch sales to anyone outside of I2G, so any rewards earned from the "sale" really came from recruitment, confirming that the products were never intended for widespread use. Instead, they were a fig leaf to hide the true purpose of the scheme: quick cash for those at the top of the pyramid.

To be fair, it's not clear that all I2G's products were entirely fraudulent. Given that I2G was operating between February 2013 and December 2014, there's a possibility that some of I2G's ideas were just ahead of their time. Indeed, the rise of online gambling, casinos, and sports betting in the wake of the Supreme Court's decision in *Murphy v. NCAA*, 138 S. Ct. 1461 (2018) suggests as much. And while the Touch was still in development, now-ubiquitous products like Facebook Live and Instagram Live didn't exist.

But that's not the point.  The government didn't have to prove that the products were entirely fraudulent.  Nor did the jury have to find that they were—although it could have.  What matters is that the only way to make real money based on I2G's incentive structure was through recruitment.  The products, even if they would have worked, were at best an ancillary benefit.

All to say, it's clear that someone paid money into I2G to access the pyramid.  And once in, you could reap the benefits of that access by recruiting others.  *This* is the *sine qua non* of a pyramid.  And all of this evidence confirms that the scope of the government's case was about whether I2G—not just the Emperors—would grow endlessly based on the impermissible incentives tied to recruiting.  So as far as the government's proof is concerned, the defendant's claim of an erroneous legal theory doesn't hold up.  The government proved the object scheme to defraud based on overwhelming evidence that I2G was a pyramid, as measured against *Koscot*.

## C.

Though the government's proof at trial makes clear that they proved I2G was a pyramid scheme, this still leaves the jury instructions.  On this point, the defendants contend that because the mail-fraud instruction defined the object scheme to defraud in reference to the Emperors, the jury possibly convicted them on the erroneous Emperor-only-capped-pyramid theory.

The instructions required the jury to find the defendants "knowingly participated in or devised a scheme to defraud in order to deprive another of money or property, that is *through the sale of Emperor positions in Infinity 2 Global or i2g*."  R.554, Jury Instructions, PageID 5265 (emphasis added).  The defendants contend that this italicized language rendered the pyramid definition legally erroneous because it required the jury to find a capped pyramid comprised of only Emperors.  But they say a capped pyramid is not a pyramid because it lacks the potential for endless growth.  Given that I've concluded that the pyramid here was I2G as a whole and am also skeptical that there can be a capped pyramid at all—this is a serious issue.

But a jury may be instructed on alternative legal theories, one incorrect and the other correct, and still, the error can be harmless.  *See Hedgpeth v. Pulido*, 555 U.S. 57, 60–62 (2008) (per curiam); *Kurlemann*, 736 F.3d at 449–50.  So long as we are sure that "the verdict would have been the same absent the error"—here absent reference to the Emperors in the mail-fraud

instruction—we can affirm the conviction. *Neder v. United States*, 527 U.S. 1, 17 (1999). When I look at the instructions as a whole, the larger legal question is whether the jury was informed of the definition, character, and nature of the crime charged—conspiracy to commit mail fraud. The instructions correctly defined conspiracy. The substantive-mail-fraud instruction correctly defined "scheme or artifice to defraud." The mail-fraud instruction also correctly defined "pyramid scheme," *see infra* Part III, and correctly gave the jury the option to find that a pyramid scheme satisfied the scheme-to-defraud element. With all of these elements correctly defined, the only question left is whether reference to the Emperors instead of I2G was so misleading as to render the jury's verdict erroneous. *United States v. Geisen*, 612 F.3d 471, 485 (6th Cir. 2010). For several reasons, I'm doubtful.

We review the prejudicial impact of an instruction "in relation to all else that happened" at trial. *Kotteakos v. United States*, 328 U.S. 750, 764 (1946). Closing arguments, though not evidence, are a helpful starting place because they highlight how the government "conceptualized the evidence and the indictment, and how the evidence was presented to the jury." *Sittenfeld*, 128 F.4th at 782 n.16; *Kurlemann*, 736 F.3d at 450 (finding erroneous instruction harmful based in part on the government having repeatedly reiterated the erroneous legal theory to the jury during closing); *see also United States v. Qureshi*, 121 F.4th 1095, 1103–04 (5th Cir. 2024) (relying on government's closing argument as evidence that jury was correctly informed on the scope of the conspiracy), *cert. denied*, No. 24-900, 2025 WL 889184 (U.S. Mar. 24, 2025) (mem.).

On this point the government is on solid ground. It—more than once—reiterated to the jury that the mail-fraud finding they needed to make was about I2G, not the Emperors. R. 671, Trial Tr. Vol. 24, PageID 7530 ("But what the defendants agreed and were knowingly promoting in this case was a pyramid scheme through their promotion of I2G or Infinity 2 Global."); *id.* ("And if you find that what Infinity 2 Global was[,] was a pyramid scheme, then you have found that the United States has satisfied the first element of Count 1. . . ."); *id.* at 7532 ("And so if you believe that Infinity 2 Global was a pyramid scheme, that the primary purpose or nature of the business was to pull in these—to recruit people . . . then you will have found that a scheme to defraud existed.").

As well, remember that the only charge the government had to prove was conspiracy. This means the government did not have to prove that mail fraud in fact occurred. As other courts have noted, an error in the object-offense instruction doesn't per se infect a conspiracy conviction if that conspiracy instruction is otherwise correct. *Qureshi*, 121 F.4th at 1103 (finding harmless an erroneous substantive-offense instruction that did not infect conspiracy conviction); *United States v. Fairley*, 880 F.3d 198, 212 (5th Cir. 2018) (finding no plain error where substantive instruction erroneously conflated two elements but because conspiracy was "distinct from the substantive counts," conspiracy conviction wasn't erroneous); *United States v. Kalaycioglu*, 210 F. App'x 825, 831–32 (11th Cir. 2006) (finding error in substantive-offense instruction wasn't reversible because it was not an essential element of conspiracy).

So long as the jury was informed on the definition, character, and nature of the acts inherent to the charged *conspiracy*, as these instructions did, we can find that the defendants were not prejudiced by the reference to the Emperors in the *substantive* instruction. *United States v. Hale*, 685 F.3d 522, 541 (5th Cir. 2012) (finding no plain error where instructions were "sufficient to apprise the jury of the definition and character of the substantive crime underlying the conspiracy charge, and because the use of actual cocaine was not necessary to commit the crime of conspiracy"); *United States v. Marino*, 562 F.2d 941, 945 (5th Cir. 1977) (omission from instructions on specific intent to conspire was not plain error because "read as a whole," instructions "adequately charged the jury as to the definition, character, and nature of the acts" of the conspiracy, and "there [wa]s no doubt that there was sufficient evidence from which the jury could have inferred beyond a reasonable doubt" defendant had specific intent). To be sure, the courts in these cases reviewed for plain error and the defendants here preserved their objections to the jury instructions. But the overall analysis about the effect of the error—*i.e.*, prejudice—is just as applicable here.

And we regularly affirm convictions in the presence of trial errors—constitutional or otherwise—where the evidence suggests the error had no effect on the verdict. *United States v. Mack*, 729 F.3d 594, 609 (6th Cir. 2013) ("The undisputed trial evidence convinces us that, if properly instructed, the jury would have found beyond a reasonable doubt as to counts three and twelve that the defendant brandished a firearm during the robberies. . . ."); *United States v.*

*Kuehne*, 547 F.3d 667, 682 (6th Cir. 2008) (same). I don't think the instruction's errant reference to Emperors prejudiced the defendants because of the overwhelming proof that the government offered about *I2G*'s character as a pyramid. *See supra* Part II.B.

I also find support from other circuits that have found that a complete omission of the substantive-offense instruction does not automatically infringe on the defendant's substantial rights. *Compare United States v. Vaglica*, 720 F.2d 388, 390–91 (5th Cir. 1983) (finding "serious" but not reversible error when district court failed to instruct jury on object of conspiracy), *with United States v. Martinez*, 496 F.2d 664, 669 (5th Cir. 1974) (finding omission of any reference to conspiracy's object was "serious" error because, read as a whole, reflected an overall failure to inform the jury on the definition, character, or nature of the acts that support a finding of importing, possessing, or distributing marijuana). *See also United States v. Kalaycioglu*, 210 F. App'x 825, 831–32 (11th Cir. 2006) (finding error in substantive-offense instruction wasn't reversible in part because defendants were only charged with conspiracy instead of a substantive honest-services charge). Those courts too looked to the circumstances of the specific prosecution, the evidence presented, and the challenge raised. *Vaglica*, 720 F.2d at 391. So as I explain above, because overwhelming evidence supported the I2G-was-a-pyramid-scheme finding, I would find any reference to the Emperors in the instruction harmless.

And finally, alternatively, *Hedgpeth*, 555 U.S. 57, also suggests the error is harmless. The Court found a per-se-reversal rule was inappropriate when, in cases like this one, the jury is "instructed on multiple theories of guilt, one of which [was] improper." *Id.* at 61. Instead, like most trial errors, such an error is subject to harmlessness review. *Id.* at 61–62. So long as the instructional error does not "vitiat[e] *all* the jury's findings," the error is harmless. *Id.* at 61 (quoting *Neder*, 527 U.S. at 11 (alteration in original)).

Only if the evidence on the valid alternative theory—here, that I2G was a general fraud— is "relatively weak," the government relies heavily on the "improper theory," and the district court's instructions on the improper theory are "interwoven throughout the jury charge," is an instructional error in this context harmful. *United States v. Andrews*, 681 F.3d 509, 522 (3d Cir. 2012) (internal quotation marks omitted) (applying these guideposts to find a *Skilling v. United*

*States*, 561 U.S. 358 (2010) instructional error harmless). Altogether, though the government relied heavily on the pyramid-scheme theory, the other factors favor a finding of harmlessness. As the majority describes, there was overwhelming evidence to support a finding of general fraud. This, combined with the government's repeated reference during closing that the jury could find a general fraud was the object of the conspiracy, and the fact that the Emperors are only referred to once in the mail-fraud instruction (rather than repeatedly), together suggest that the reference was harmless. R.671, Trial Tr. Vol. 24, PageID 7724 ("And when you look at the jury instructions, it says there's actually two ways to commit mail fraud. You can have a structure or artifice to defraud one way or through the pyramid scheme. . . . The United States submits . . . that they did both. . . ."); *see also United States v. Donovan*, 539 F. App'x 648, 653 (6th Cir. 2013) (finding instructions harmless that incorrectly said Viagra was a controlled substance—so an invalid object of a conspiracy—but correctly listed other controlled substances; because no evidence connected him to the Viagra-selling conspiracy, affirmed conviction).

So though there was discussion of the Emperors at trial, this isn't surprising because it was part of I2G's overall fraud. And though there was reference to the Emperors in the jury instructions, I think that was harmless when viewed in light of the jury instructions as a whole and the government's evidence at trial.

One final note. The defendants extend this theory about the capped pyramid to argue that they were entitled to an affirmative defense on anti-saturation. Picking up on our suggestion in *Gold Unlimited*, the defendants insist that they had an effective "anti-saturation" or "anti-pyramiding" policy in place because the Emperors were capped at 5,000. In their view, this prevented endless growth, and comports with what the government proved at trial—that is, a capped pyramid. But I disagree.

Anti-pyramiding policies must be more than cosmetic. Rather to be effective, they must connect recruitment to retail sales, and in this way, defeat the possibility of endless growth.[4] *Gold Unlimited*, 177 F.3d at 482. By doing so, an MLM can defeat the second *Koscot* factor.

---

[4]*In the Matter of Amway* is the best example of a legal MLM implementing effective anti-pyramiding policies. 93 F.T.C. 618. Amway manufactured home products: cleaning supplies, soaps, detergents, and the like.

The 5,000-Emperor cap does nothing to overcome the unlimited-growth problem. It's true the cap served a practical purpose—it prevented diluting the casino returns. But there's no evidence it also tied recruiting bonuses to product sales. So on this front, the policy failed to accomplish what an anti-pyramiding policy must: link recruitment and product sales. And even more fundamentally, the cap did not limit the number of new Players, Novices, or High Rollers who could be recruited. In this way, the cap on *Emperors* didn't address the possibility of *I2G*'s endless growth. For both reasons, I would find that this cap, though novel and superficially tied to the second *Koscot* factor, fails in substance as an anti-pyramiding policy. So though the burden is not heavy to show there is some support in the law for the instruction, there was neither support in the law nor the evidence to support a jury finding that I2G had overcome the second *Koscot* factor. *See id.* at 482–83.[5]

---

Three familiar firms—Procter & Gamble, Lever Bros., and Colgate-Palmolive—accounted for over 80% of this market, and Amway was having trouble breaking in. *Id.* at 710. To overcome the barriers to entry, Amway developed a "direct selling" network and avoided retail stores altogether. *Id.* at 710–11. They relied on their 360,000 distributors to purchase products, then resell them at retail to customers or to other distributors (who they had recruited). *Id.* at 711–12. In the latter case, a second-order distributor would resell products too. Distributors made money from the difference in the wholesale price they purchased the product from Amway and the retail price at which they sold the product. *Id.* at 712–14. And when they recruited new distributors, they also earned a commission.

To prevent the endless-growth problem Amway had implemented several policies to ensure that recruiting promoted product sales. Two are illustrative. First, the "70 percent rule" required that a distributor sell at least 70% of the product he bought each month before he could receive any bonus. *Id.* at 716. Second, the "10 customer rule" required that a distributor make unique sales to ten different customers each month (and provide proof of that sale). *Id.* These policies highlighted an internal emphasis on product sales which meaningfully limited the possibility that any distributor would be overly motivated by recruiting bonuses and avoid his sales obligations. This way, "retail selling [remained] an essential part of being a distributor." *Id.* So Amway was able to demonstrate it was a *legal* MLM not at risk of growing like an endless chain.

[5]I admit, complicating this conclusion is the government's puzzling statement that saturation wasn't a problem in this case. The government said: "[S]aturation (and thus anti-saturation) is not at issue. . . ." R. 381, Gov't Mot., PageID 2922–23. And continued: "For I2G, however, saturation is not the problem. Unlike in *Gold Unlimited*, the United States has no plans to present a witness to testify on the dangers of market saturation. . . . Instead, the United States plans to show that I2G is a pyramid scheme—not because of any saturation problem, but rather because I2G's scheme meets the definition approved in *BurnLounge*." *Id.* I read this statement as saying I2G had not *reached* a point of saturation—*i.e.*, they had not grown to a point where the pyramid would collapse. And the government did not intend to argue that saturation would imminently occur.

To be fair, the government does not have to prove saturation before they can prosecute a pyramid scheme. *Cf. Gold Unlimited*, 177 F.3d at 482 ("The alternative—placing the burden on the government—forces the government to wait until after the collapse, as that alternative permits operators to maintain that the absence of collapse proves the success of the anti-saturation policies."). A point government's counsel reiterated at argument. Oral Argument at 37:20–37:40 (No. 22-6114) ("The government does not have to prove as an element of that

\*     \*     \*

All said, the government did not present an erroneous legal theory to the jury. The indictment, the proof at trial, and the instructions show the government proved both that I2G was a general fraud and a pyramid. Though the instructions have an erroneous reference to the Emperors, that error was harmless, and with the lens on I2G rather than the Emperors, the anti-saturation argument similarly fails.

## III.

That still leaves one errant jury instruction issue. Defendants claim that the mail-fraud instruction did not sufficiently distinguish between a legal MLM and a pyramid.

We review jury instructions for an abuse of discretion. *Geisen*, 612 F.3d at 485. Trial courts retain significant latitude to craft instructions, but they abuse their discretion when the jury charge doesn't accurately reflect the law. *Id.* (quoting *United States v. Ross*, 502 F.3d 521, 527 (6th Cir. 2007)). The only remaining challenge to the jury instructions is that they did not sufficiently distinguish between legal and illegal MLMs. The instructions read:

> A 'pyramid scheme' is any plan, program, device, scheme, or other process characterized by the payment by participants of money to the company in return for which they receive the right to sell a product and the right to receive in return for recruiting other participants into the program rewards which are unrelated to the sale of the product to ultimate users. *The structure of a pyramid scheme suggests that the focus is on promoting the sale of interests in the venture rather than the sale of products, where participants earn the right to profits by recruiting other participants, who themselves are interested in recruitment fees rather than products.* A pyramid scheme constitutes a scheme or artifice to defraud for purposes of this instruction.

---

definition of [a] pyramid scheme . . . that it was going to collapse or that it was doomed to fail."); *Id.* at 39:58–40:15 ("The government doesn't have to affirmatively prove that [saturation] has happened. . . .").

But I would reject a view that a fraud can also be a pyramid without risk of saturation—that is, endless growth. That means that if I2G had only consisted of the 5,000 Emperors, but all else remained the same—in terms of the link between earnings and recruiting—it would undoubtedly have still been a fraud but not an illegal pyramid. The 5,000 limit may create an artificial point of "saturation," but that is not quite what saturation means when it comes to pyramids. Saturation refers to endless growth and reflects the essential feature that makes a pyramid per se illegal. A so-called "capped pyramid" lacks this aspect so would likely not be a pyramid, even if it were a fraud.

*Compare* R.554, Jury Instructions, PageID 5265 (emphasis added), *with Gold Unlimited*, 177 F.3d at 481. The unitalicized portion of this instruction is a direct copy of the instructions approved in *Gold Unlimited*. Still, the panel there noted that there was room for improvement and prudent district courts might adjust to better reflect the difference between legitimate MLMs and illegal pyramids. *Gold Unlimited*, 177 F.3d at 483. And here the district judge did exactly that. For support, he relied on *BurnLounge*, a recent Ninth Circuit opinion discussing what makes a pyramid fraudulent. *FTC v. BurnLounge, Inc.*, 753 F.3d 878, 889 (9th Cir. 2014). The judge's additions highlighted the feature that distinguishes a legal MLM from an illegal pyramid: over-incentivizing recruitment in a way that facilitates endless growth. These additions were not erroneous.

## IV.

Finally, I want to say a couple of things about the securities fraud, including about the apparent incongruity between the government's pyramid-scheme theory and its securities-fraud theory. Defendants make two challenges to their securities fraud conviction. First, they argue that the Emperor positions were not securities, so could not support a securities-fraud conviction under 15 U.S.C. § 78j. And second, they argue that the jury instructions incorrectly define "security." But the Emperor was a security and there was no error in the instructions.

## A.

As to the sufficient evidence, the only issue the defendants raise on appeal is whether the Emperor was a security. And everyone agrees that it must satisfy the definition of investment contract to trigger the fraud provisions of the Securities Acts. *Id.* § 78c(a)(10).

The test for whether a particular financial relationship is an investment contract is by now, well-known. *Howey*'s four-part test asks "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *SEC v. Edwards*, 540 U.S. 389, 393–94 (2004) (quoting *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946)). The test is flexible, designed to capture new and creative financial relationships, so "capable of adaptation to meet the countless and variable schemes" that might be created. *Id.* at 393 (quoting *Howey*, 328 U.S. at 229). Given the creativity that's necessarily involved with

evading securities regulation, we look to the substance of the transaction and determine whether its "economic realities" satisfy *Howey* rather than rely on the label that its purchasers and promotors assign to it. *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 558–59 (1979) (quoting *United Hous. Found., Inc. v. Forman,* 421 U.S. 837, 851–852 (1975)). This way, "[n]ovel, uncommon, or irregular devices" may still be captured within the reach of the act. *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943). So we look to the "character the instrument is given in commerce." *Id.* at 352–53. This includes the "terms of the offer, the plan of distribution, and the economic inducements" promised to potential purchasers. *Id.* at 353. Thus the promotor's sales tactics are within our reach to consider. *Id.*

On the government's theory, the Emperor is a security because (1) an Emperor invests money ($5,000), (2) there was a common pooling of funds and Emperors shared in a proportional profit from the casino, (3) Emperors were attracted by the possibility of a return from the casino, and (4) profits came from the managerial efforts of I2G.

The majority holds that the Emperor was a security and I agree. But I think we should acknowledge one quirk in the government's theory on the efforts-of-others prong. This element addresses the relationship between the investor and the venture. We don't require that the profits be derived, "in some strict sense, *solely* from the efforts of others." *Odom v. Slavik*, 703 F.2d 212, 215 (6th Cir. 1983). Typically, we look to the economic realities of the transaction to determine whether the investor's involvement is limited to ministerial functions. If merely ministerial, the venture won't be excluded from the securities laws. *Id.* In other words, something like common stock is a security because I buy the stock and then reap the rewards because of the efforts of the company's officers and employees.

The government thoroughly proved that IBOs couldn't make any money except for their own effort in recruiting others into the scheme. But that effort had little, if any impact on the success or failure of the casino. I think this potential disconnect isn't a problem, however, under *Howey*. What's relevant to the security finding is that the promotors promised profits from the efforts of others, even if this turned out to be false.

Consider a hypothetical based on the facts of *Howey*. A promotor sells tracts of land in an orange grove with the promise to develop, manage, and nurture the grove. This combination—land sale and land management—is what makes the transaction an investment contract. But if the land had never existed and the "land" was still sold to investors, there's still a security. Whether the land existed or not doesn't change the character of what was sold. And it wouldn't make sense for one circumstance to be covered by the securities laws and the other not. Otherwise, a securities fraudster benefits from committing a bigger fraud. *SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995) (Posner, J.) ("It would be a considerable paradox if the worse the securities fraud, the less applicable the securities laws."); *id.* ("An elementary form of [the] misrepresentation [in the sale of securities] is misrepresenting an interest as a security when it is nothing of the kind.").

So we look to I2G's promotions and representations to the public. As the majority details, the defendants represented that IBOs would have ministerial functions in the operations of the company and could sit back, relax, and collect the passive income generated by the casino. This is quintessentially relying on the "efforts of others." *Warfield v. Alaniz*, 569 F.3d 1015, 1021–22 (9th Cir. 2009) ("[W]hile the subjective intent of the purchasers may have some bearing on the issue of whether they entered into investment contracts, we must focus our inquiry on what the purchasers were offered or promised."); *SEC v. Banner Fund Int'l*, 211 F.3d 602, 615 (D.C. Cir. 2000) (relying on the program's brochure advertising program to determine how transaction was represented before finding it was a security); *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1039–40 (10th Cir. 1980) ("Central to this test is the promotional emphasis of the developer. Characterization of the inducement cannot be accomplished without a thorough examination of the representations made by the defendants as the basis of the sale." (citations omitted)). So I would find the Emperor position was a security.[6]

---

[6]That I2G contracted with a third party to manage the casino also doesn't impact this efforts-of-others calculus because it doesn't change the Emperor's relationship with I2G. When the investor has "no reasonable alternative" but to rely on the promotor, the efforts of others prong is satisfied. *Alunni v. Dev. Res. Grp., LLC*, 445 F. App'x 288, 296 (11th Cir. 2011) (quoting *Gordon v. Terry*, 684 F.2d 736, 741 (11th Cir. 1982)).

**B.**

Finally, the defendants challenge the instruction's definition of "investment contract." They argue it lacks a proper definition of horizontal commonality, and that it incorrectly defined "efforts of others."

As a reminder, we review jury instructions for abuse of discretion. *Geisen*, 612 F.3d at 485. A district judge abuses his discretion when the instructions incorrectly describe the law. *Id.* (quoting *Ross*, 502 F.3d at 527). But little needs to be said here. The instruction is clear and legally accurate. It reads in relevant part:

> The term "investment contract" refers to a contract transaction or scheme whereby a person invests his or her money, in a common enterprise, and is led to expect profits derived primarily from the efforts of others (i.e., persons other than the investor). A *common enterprise ties the interest of each investor in a pool of investors to the success of the overall venture such that the investors share a common fortune*.

R.554, Jury Instructions, PageID 5267–68. The italicized portion concerns horizontal commonality and accurately describes this circuit's law. The instruction needed to explain that the relevant relationship the jury needed to identify was among investors. *Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385, 394 (6th Cir. 1989) ("[T]here must also be a horizontal relationship between or among investors, with the funds of two or more investors going into a common pool from which all may benefit."). It does that.

The instruction also correctly defines "efforts of others." The district court, at the defendant's request, clarified that "others" refers to "persons other than the investor." The defendants take issue now because they had asked that it be more explicit. But the language the judge relied on reasonably reflects the law. The "efforts of others" does not prevent the investor from having *any* role in the venture, it just prevents the investor from holding a managerial role. This is exactly what the instructions asked the jury to find.

So for all these reasons, I concur and affirm the convictions.